UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO. 09-

FILED by _265_ D.C.

SEP 0 1 2009

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. – MIAMI

JEANNETTE HAUSLER as Successor
Personal Representative of the Estate of
ROBERT OTIS FULLER, ("BOBBY
FULLER") Deceased, on behalf of
THOMAS CASKEY as Personal
Representative of the Estate of LYNITA
FULLER CASKEY, surviving daughter of
ROBERT OTIS FULLER, The ESTATE
OF ROBERT OTIS FULLER,
FREDERICK FULLER, FRANCES
FULLER, GRACE LUTES, JEANNETTE
FULLER HAUSLER, AND IRENE
MOSS,



09-22600

DIV-KING

MAGISTRATE
BANDSTRA

Plaintiff(s),

vs.

THE REPUBLIC OF CUBA, FIDEL
CASTRO RUZ, individually and as
President of the State and Counsel of
Ministers, Head of The Communist Party
and Commander-in-Chief of the Military,
RAUL CASTRO RUZ, individually and as
First Vice President of the Counsel of
State and Council of Ministers and Head
of the Cuban Revolutionary Armed
Forces, THE CUBAN REVOLUTIONARY
ARMED FORCES, and EL MINISTERIO
DEL INTERIOR,

Defendants,

vs.

TATA COMMUNICATIONS (AMERICA)
INC.,

Garnishee

_____/

**GARNISHEE, TATA COMMUNICATIONS
(AMERICA) INC.'S NOTICE OF
REMOVAL**

Higer Lichter & Givner

Garnishee, Tata Communications (America) Inc. ("Tata Communications"),
files this Notice of Removal pursuant to 28 U.S.C. §§ 1330, 1331, 1332, 1441 and
1446, and removes to this Court the (second) garnishment action filed against Tata
Communications in the civil action known as *Jeannette Hausler, et al. v. The
Republic of Cuba*, Case No. 02-12475 CA 09, previously filed in 11th Circuit Court
in Miami-Dade County, Florida. The grounds for removal are as follows:

## STATE COURT ACTION

1.      Plaintiffs have served upon Tata Communications a writ of
garnishment in aid of execution of a judgment entered in Plaintiffs' favor and
against Defendants, The Republic of Cuba; Fidel Castro Ruz; Raul Castro Ruz; The
Cuban Revolutionary Armed Forces; and El Ministerio Del Interior (collectively, the
"Cuban Defendants") in Miami-Dade County Circuit Court, Case No. 02-12475 CA
09 (the "State Court Action").  Plaintiffs allegedly brought the State Court Action
under, *inter alia*, 28 U.S.C. §§ 1602 *et seq.* (the Foreign Sovereign Immunities Act of
1976, or "FSIA") to recover damages from the Cuban Defendants for the alleged
torture and killing of Robert Otis Fuller ("Bobby Fuller") in Cuba in 1960.

2.      After the Cuban Defendants defaulted by failing to appear, Plaintiffs
recovered a money judgment against the Cuban Defendants.  In their most recent
effort to collect on the judgment, Plaintiffs obtained permission from the Circuit
Court to issue multiple writs of garnishment to various telecommunications
companies, including Tata Communications (collectively the "Writs").  On August 4,
2009, Tata Communications was served with the current (and second) Writ of

Higer Lichter & Givner

Garnishment against it (the "Tata Communications Writ"). On August 19, 2009, Tata Communications filed its Answer and Affirmative Defenses to Writ of Garnishment. These documents constitute the only process, pleadings, or papers served in this current garnishment action upon Tata Communications. A copy of the Tata Communications Writ is attached as Exhibit A, and a copy of Tata Communications' Answer and Affirmative Defenses to Writ of Garnishment is attached as Exhibit B.

3.    A certified copy of the underlying Amended Final Judgment entered in the State Court Action is attached as Exhibit C and a copy of the underlying Second Amended Complaint is attached as Exhibit D.   No further proceedings have occurred in this garnishment action against Tata Communications.

4.    This Notice of Removal is being filed within thirty (30) days of receipt by Tata Communications of a copy of the Tata Communications Writ and is timely filed under 28 U.S.C. § 1446(b). *Webb v. Zurich Ins. Co.*, 200 F.3d 759, 760 (11th Cir. 2000) (citing *Butler v. Polk*, 592 F.2d 1293 (5th Cir. 1979), for the proposition that garnishment actions brought post-judgment are separate civil actions removable to federal court).   Tata Communications, as a non-party to the underlying action in *Hausler et al. v. Republic of Cuba.*, Case No. 02-12475 CA 09 (Fla. 11th Cir. Ct.), is not, however, attempting to (and could not) remove the underlying action under 28 U.S.C. §1446 or otherwise.

Higer Lichter & Givner

## JURISDICTION PURSUANT TO 28 U.S.C. §§ 1330 & 1331

5.    District courts have original jurisdiction pursuant to 28 U.S.C. § 1330 to hear suits, not barred by foreign sovereign immunity, that are brought against foreign states. *Alejandre v. Republic of Cuba*, 996 F. Supp. 1239, 1247 (S.D. Fla. 1999) ("*Alejandre I*"). As explained above, Plaintiffs allegedly brought this action under the FSIA, 28 U.S.C. §§ 1602 *et seq.,* which provides immunity from suit to a foreign state unless the claim falls within an enumerated exception set forth in 28 U.S.C § 1605. *See id.*

6.    Here, this action falls within section 1330 jurisdiction, as the Miami-Dade state court concluded after a non-jury trial that the Cuban Defendants were subject to suit under 28 U.S.C. § 1605 -- i.e., Defendants were not entitled to immunity. *See* Amended Final Judgment at page 5; *Jones v. Petty-Ray Geophysical*, 954 F.2d 1061, 1065 n.5 (5th Cir. 1992) (noting that foreign sovereign's immunity must be considered to determine subject matter jurisdiction even where foreign sovereign was not before the court); *Weininger v. Castro*, 462 F. Supp. 2d 457, 480 (S.D.N.Y. 2006) (acknowledging section 1330 jurisdiction where garnishee removed New York state court proceeding to domesticate Florida state court judgment awarding damages to plaintiff and against Cuba, Fidel Castro, and Raul Castro pursuant to the FSIA, 28 U.S.C. § 1605).

7.    This action also falls within section 1331 jurisdiction based on the federal questions presented by the Writs. Specifically, the Tata Communications Writ seeks to determine whether Tata Communications is indebted to the Cuban

Defendants "and their agencies and instrumentalities." Exhibit A. This necessarily contemplates an analysis of what constitutes "an agency or instrumentality of a foreign state" as defined by the FSIA, 28 U.S.C. § 1603(b). *See Alejandre v. Telefonica Larga Distincia de Puerto Rico, Inc.*, 183 F.3d 1277, 1282-83 (11th Cir. 1999), *reversing Alejandre v. Republic of Cuba*, 42 F. Supp. 2d 1317 (S.D. Fla. 1999) ("*Alejandre II*"). Further, Plaintiffs ultimately are seeking to garnish funds potentially owed to The Republic of Cuba and/or its agencies and instrumentalities to satisfy their judgment against the Cuban Defendants. Cuban assets in the United States are blocked pursuant to the Cuban Assets Control Regulations ("CACR") issued by the Office of Foreign Assets Control of the United States Department of the Treasury ("OFAC"). *Alejandre II*, 42 F. Supp. 2d at 1324. In this regard, the CACR prevent the transfer of any assets subject to these regulations in the absence of a license from OFAC. Thus, Plaintiffs must proceed pursuant to Section 201 of the Terrorism Risk Insurance Act ("TRIA"), which provides:

> Notwithstanding any other provision of law, and except as provided in subsection (b) [relating to diplomatic property], in every case which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605(a)(7) of title 28, United States Code, the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

TRIA § 201(a), codified at note to 28 U.S.C. § 1610. Plaintiffs have argued in the past and likely will argue that TRIA provides for the satisfaction of certain judgments against terrorist parties and their agencies and instrumentalities. *See*

*Weininger*, 462 F. Supp. 2d at 499   (where court noted position of the U.S. Department of Justice that a court determination that funds were subject to TRIA meant that the funds could be distributed without a license from OFAC). Accordingly, inherent in this matter are complex federal issues, including a determination under TRIA that any funds Plaintiffs seek to garnish are available for execution.

Plaintiffs have previously acknowledged in previous garnishment actions brought against Tata Communications and other telecommunications carriers in aid of execution of the same judgment were properly removed to this Court. *See* Notice of Joint Stipulation Regarding Removal and Order denying Plaintiff's motion to remand those garnishment proceedings, copies of which are attached as Composite Exhibit E.

## JURISDICTION PURSUANT TO 28 U.S.C. § 1332

8.     The District Courts of the United States are given original jurisdiction over all civil matters where the matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs, and is between citizens of different states. 28 U.S.C. §1332(a).

9.     The matter in controversy here, exclusive of interest and costs, exceeds the sum or value of $75,000.00.  As set forth in the Tata Communications Writ, Plaintiffs are seeking to garnish sums in excess of $99,000,000.00.  Exhibit A.

10.     Diversity of citizenship also exists in this case. *Lewis v. AT&T Corp.*, 898 F. Supp. 907 (S.D. Fla. 1995) (motion for remand denied where basis for

diversity is established in notice of removal); *accord Woolard v. Heyer-Schulte,* 791 F. Supp. 294 (S.D. Fla. 1992).

11.    Each Plaintiff is a citizen of the State of Florida.    Specifically, Jeannette Hausler, as successor personal representative of the estate of Bobby Fuller, retains the citizenship of the deceased. *Harris v. Commonwealth Nat'l Life Ins. Co.,* 929 F. Supp. 393, 395 (M.D. Ala. 1996).   According to the Amended Final Judgment, Bobby Fuller was a dual citizen of the United States and Cuba at the time of his death in 1960. Exhibit C at 8. Only his American citizenship is relevant for diversity purposes. *Mutuelles Unies v. Kroll & Linstrom,* 957 F.2d 707, 711 (9th Cir. 1992). The Amended Final Judgment indicates that Bobby Fuller's home in the United States was in Miami, Florida.  Exhibit C, at pp. 8-9.  Thus, the personal representative of his estate is a citizen of Florida. Similarly, Thomas Caskey, the personal representative of the Estate of Lynita Fuller Caskey, the surviving daughter of Bobby Fuller, retains the citizenship of the deceased.   The Second Amended Complaint indicates that Lynita Fuller Caskey resided in Florida. Exhibit D, ¶ 2. Thus, the personal representative of her estate is a Florida citizen as well.  Finally, the siblings of Bobby Fuller -- Frederick Fuller, Frances Fuller, Grace Lutes, Jeannette Hausler, and Irene Moss -- are each citizens of the State of Florida.

12.    Tata Communications is a Delaware corporation organized and existing under the laws of the State of Delaware, with its principal place of business

in the State of Virginia. For diversity purposes, Tata Communications is therefore a citizen of the States of Delaware and Virginia. 28 U.S.C. § 1332(c)(1).

13. Accordingly, the requirements for diversity jurisdiction under 28 U.S.C. § 1332 are met.

## REMOVAL PROCEDURE

14. As set forth above, garnishment actions brought post-judgment are separate civil actions removable to federal court. *Webb v. Zurich Ins. Co.*, 200 F.3d 759, 760 (11th Cir. 2000) (citing *Butler v. Polk*, 592 F.2d 1293 (5th Cir. 1979)). Because the matter related to the Tata Communications Writ is deemed a separate matter, the Tata Communications Writ can be removed independent of the other Writs in this case. *Connecticut Bank of Commerce v. Republic of Congo*, 440 F. Supp. 2d 346, 350-52 (D.Del. 2006) (holding that garnishment proceedings are separate and distinct civil actions which are removable in their own right).

15. Because garnishment actions are separate and removable in their own right, a garnishee need not obtain the consent of the defendant or any other garnishees to satisfy the unanimity requirement for purposes of removal. *See id.* at 352 n.8.

16. In sum, removal is proper under 28 U.S.C. § 1441. This Notice is signed pursuant to Rule 11 of the Federal Rules of Civil Procedure.

17. Promptly after the filing of this Notice of Removal, a true copy of this Notice of Removal will be provided to all adverse parties pursuant to 28 U.S.C. § 1446(d).

Higer Lichter & Givner

18.    Concurrently with the filing of this Notice of Removal, Garnishee Tata Communications will be filing a Notification of Filing of Notice of Removal with the Clerk of the 11th Circuit Court in Miami-Dade County, Florida, which will include a copy of this Notice of Removal. A copy of the Notification of Filing of Notice of Removal is attached as Composite Exhibit F.

## RELIEF REQUESTED

**WHEREFORE**, Garnishee Tata Communications (America) Inc. hereby removes this action from the 11th Circuit Court in Miami-Dade County, Florida, to the United States District Court for the Southern District of Florida, and prays that this Court issue such orders and process as are necessary to preserve its jurisdiction over this matter.

Respectfully submitted,

Higer Lichter & Givner, LLP
Attorneys for Garnishee
Tata Communications (America) Inc.
18305 Biscayne Blvd., Suite 402
Aventura, Florida 33160
Telephone: 305-933-9970
Facsimile: 305-933-0998

By: _____
Michael J. Higer
Florida Bar No. 500798

Higer Lichter & Givner

## CERTIFICATE OF SERVICE

I **HEREBY CERTIFY** that a true and correct copy of the foregoing was served

by U.S. Mail this 1st day of September, 2009, to all parties and counsel on the attached

service list.

Michael J. Higer

## SERVICE LIST

*HAUSLER v. THE REPUBLIC OF CUBA, FIDEL CASTRO RUZ,*
*and TATA COMMUNICATIONS AMERICA*, Garnishee
CASE NO.: 09-
United States District Court Southern District of Florida

Roberto Martinez, Esquire
Karen Olivia-Marie Stewart, Esquire
Colson Hicks Eidson
**Attorneys for Plaintiffs**
255 Aragon Avenue
Coral Gables, FL 33134
T: 305- 476-7400
F: 305- 476-7444
bob@colson.com

Alfonso J. Perez, Jr., Esq.
Rasco, Reininger, Perez, Esquenazi
& Virgil, P.A.
**Attorneys for Plaintiffs**
283 Catalonia Avenue
Second Floor
Coral Gables, FL 33134
T: 305-476-7100
F: 305-476-7102
aperez@rrpev.com

Higer Lichter & Givner

IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO. 02-12475-CA-09

JEANNETTE FULLER HAUSLER as
Successor Personal Representative
of the Estate of ROBERT OTIS FULLER,
("BOBBY FULLER"), Deceased, on behalf
of THOMAS CASKEY as Personal
Representative of the Estate of LYNITA
FULLER CASKEY, surviving daughter
of ROBERT OTIS FULLER, The
ESTATE OF ROBERT OTIS FULLER,
FREDERICK FULLER, FRANCES
FULLER, GRACE LUTES, JEANNETTE
FULLER HAUSLER, AND IRENE MOSS

        Plaintiffs,

vs.

THE REPUBLIC OF CUBA, FIDEL CASTRO
RUZ, individually and as President of the
State and Council Of Ministers, Head of
the Communist Party and Commander-in
Chief of the Military, RAUL CASTRO RUZ,
individually and as First Vice President Of
the Council of State and Council of Ministers
and Head of the Cuban Revolutionary
Armed Forces, The CUBAN
REVOLUTIONARY ARMED FORCES,
and EL MINISTERIO DEL INTERIOR,

        Defendants.

_____/

**Served**
Date _8-4-09_  Time _12:15 Pn_
MCN, No. 111
is a certified process server in the
Circuit and County Courts
in and for the Second Judicial Circuit

## WRIT OF GARNISHMENT TO
## TATA COMMUNICATIONS (AMERICA) INC.

STATE OF FLORIDA:
To Each Sheriff of the State,
Or licensed process server employed by Civil Process Plus, Inc:

**EXHIBIT**
A

YOU ARE COMMANDED to summon the garnishee, TATA COMMUNICATIONS (AMERICA) INC., c/o Corporation Service Company, 1201 Hayes Street, Tallahassee, Florida 32301, to serve an answer to this writ on the attorneys for the Plaintiff, Roberto Martinez, Esq., Colson Hicks Eidson, 255 Aragon Ave. Coral Gables, Florida 33134 and Alfonso Perez, Esq., Rasco Reininger Perez Esquenazi & Vigil, P.A., 283 Catalonia Avenue, Coral Gables, FL 33134, within 20 days after service on the garnishee, exclusive of the day of service, and to file the original with the clerk of this court either before service on the attorney or immediately thereafter, stating whether the garnishee holds, maintains, or is in the possession or control of any property (whether real or personal, tangible or intangible, including but not limited to cash, deposits, accounts, money, checks, drafts, debts, indebtedness obligations, notes, accounts payable or receivable, bank deposits, instruments, securities, security entitlements, security accounts, equity interests, claims and contractual rights or obligations, and/or interests of any kind in the foregoing, whether present, future, or contingent) of Defendants The Republic of Cuba, Fidel Castro Ruz, Raul Castro Ruz, the Cuban Revolutionary Armed Forces, and the Ministerio del Interior, and/or their agencies or instrumentalities, including, but not limited to Empresa de Telecomunicaciones de Cuba, S.A. ("ETECSA"), or any other Cuban entity, that is blocked pursuant to the Cuban Assets Control Regulations, 31 C.F.R. §§ 515.201 or is otherwise directly or indirectly indebted to Defendants The Republic of Cuba, Fidel Castro Ruz, Raul Castro Ruz, the Cuban Revolutionary Armed Forces, and the Ministerio del Interior, and/or their agencies or instrumentalities, including, but not limited to Empresa de Telecomunicaciones de Cuba, S.A. ("ETECSA"), or any other Cuban entity, at the time of the answer or was indebted at

the time of service of the writ, or at any time between such times, and in what sum and what property or interests in property of the Defendants and/or their agencies or instrumentalities the garnishee holds, maintains, or is in possession or control of at the time of the answer or had at the time of service of this writ, or at any time between such times, and whether the garnishee knows of any other person that is indebted to the Defendants and/or their agencies or instrumentalities, or who may hold, maintain or be in the possession or control of any of the property in which the Defendants The Republic of Cuba, Fidel Castro Ruz, Raul Castro Ruz, the Cuban Revolutionary Armed Forces, and the Ministerio del Interior, and/or their agencies or instrumentalities have any interest of any nature whatsoever, whether direct or indirect, present, future, or contingent.  The amount set in plaintiff's motion is $99,000,000.00 million plus accrued interest to date.

DATED on _____          **JUL 3 1 2009**

<div style="margin-left:40%">

Harvey Rubin,
As Clerk of the Court

                    YADIRA GUTIERREZ
By: _____

</div>

## NOTICE TO DEFENDANT OF RIGHT AGAINST GARNISHMENT
## OF WAGES, MONEY, AND OTHER PROPERTY

The writ of Garnishment delivered to you with this Notice means that wages, money, and other property belonging to you have been garnished to pay a court judgment against you. HOWEVER, YOU MAY BE ABLE TO KEEP OR RECOVER YOUR WAGES, MONEY, OR PROPERTY. READ THIS NOTICE CAREFULLY.

State and federal laws provide that certain wages, money, and property, even if deposited in a bank, savings and loan, or credit union, may not be taken to pay certain types of court judgments. Such wages, money and property are exempt from garnishment. The major exemptions are listed on the form for Claim of Exemption and Request for Hearing. This list does not include all possible exemptions. You should consult a lawyer for specific advice.

> TO KEEP YOUR WAGES, MONEY, AND OTHER PROPERTY FROM BEING GARNISHED, OR TO GET BACK ANYTHING ALREADY TAKEN, YOU MUST COMPLETE A FORM FOR CLAIM OF EXEMPTION AND REQUEST FOR HEARING AS SET FORTH ON THE REVERSE AND HAVE THE FORM NOTARIZED. YOU MUST FILE THE FORM WITH THE CLERK'S OFFICE WITHIN 20 DAYS AFTER THE DATE YOU RECEIVE THIS NOTICE OR YOU MAY LOSE IMPORTANT RIGHTS. YOU MUST ALSO MAIL OR DELIVER A COPY OF THIS FORM TO THE PLAINTIFF AND THE GARNISHEE AT THE ADDRESSES LISTED ON THE WRIT OF GARNISHMENT.

If you request a hearing, it will be held as soon as possible after your request is received by the court. The plaintiff must file any objection within 3 business days if you hand delivered to the plaintiff a copy of the form for Claim of Exemption and Request for Hearing or, alternatively, 8 business days if you mailed a copy of the form for claim and request to the plaintiff. If the plaintiff files an objection to your Claim of Exemption and Request for Hearing, you will be notified of the time and date of the hearing. You may attend the hearing with or without an attorney. If the plaintiff fails to file an objection, no hearing is required, the writ of garnishment will be dissolved and your wages, money, or property will be released.

> YOU SHOULD FILE THE FORM FOR CLAIM OF EXEMPTION IMMEDIATELY TO KEEP YOUR WAGES, MONEY, OR PROPERTY FROM BEING APPLIED TO THE COURT JUDGMENT. THE CLERK CANNOT GIVE YOU LEGAL ADVICE. IF YOU NEED LEGAL ASSISTANCE YOU SHOULD SEE A LAWYER. IF YOU CAN'T AFFORD A PRIVATE LAWYER, LEGAL SERVICES MAY BE AVAILABLE. CONTACT THE MIAMI-DADE BAR ASSOCIATION 305-371-2220; THE FLORIDA BAR ATTORNEY REFERRAL SERVICE 1-800-342-8011; THE PUT SOMETHING BACK PROGRAM 305-579-5733; OR LEGAL SERVICES OF GREATER MIAMI 305-576-0080.

### AMERICANS WITH DISABILITIES ACT OF 1990
IF YOU ARE A PERSON WITH A DISABILITY WHO NEEDS ANY ACCOMMODATION TO PARTICIPATE IN THIS PROCEEDING, YOU ARE ENTITLED, AT NO COST TO YOU, TO THE PROVISION OF CERTAIN ASSISTANCE. PLEASE CONTACT THE DADE COUNTY COURT'S ADA COORDINATOR AT 175 N.W. 1ST AVENUE, SUITE 2702, MIAMI, FLORIDA, 33128, TELEPHONE NUMBERS (305) 349-7175 FOR VOICE, (305) 349-7174 FOR TDD AND (305) 349-7011 FOR FAX, WITHIN TWO (2) WORKING DAYS OF YOUR RECEIPT OF THIS DOCUMENT. TDD USERS MAY ALSO CALL 711, FOR THE FLORIDA RELAY SERVICE.

Important - See Reverse

Note:  The form "Affidavit of Service by Defendant Pursuant to F.S. 77.041 (3) and Request for Clerk to Dissolve Writ" can be obtained from the Clerk's Office

Important - See reverse

CLK/CT 862 REV. 6/08

Clerk's web address: www.miami-dadeclerk.com

☐ IN THE CIRCUIT COURT OF THE ( )ENTH JUDICIAL CIRCUIT IN AND FOR MIA·. )ADE COUNTY, FLORIDA
☐ IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

| DIVISION<br>☐ CIVIL<br>☐ OTHER | CLAIM OF EXEMPTION<br>AND REQUEST FOR HEARING<br>(AFEG) | CASE NUMBER |
|---|---|---|
| PLAINTIFF(S) | VS. DEFENDANT(S) | CLOCK IN |

**I CLAIM EXEMPTIONS from garnishment under the following categories as checked:**

1. Head of family wages. (You must check a or b below.)
☐ a. I provide more than one-half of the support for a child or other dependent and have net earnings of $500.00 or less per week.
☐ b. I provide more than one-half of the support for a child or other dependent, have net earnings of more than $500.00 per week, but have not agreed in writing to have my wages garnished.
☐ 2. Social Security benefits.
☐ 3. Supplemental Security Income benefits.
☐ 4. Public assistance (welfare).
☐ 5. Workers' Compensation.
☐ 6. Unemployment Compensation.
☐ 7. Veteran's benefits.
☐ 8. Retirement or profit-sharing benefits or pension money.
☐ 9. Life Insurance benefits or cash surrender value of a life insurance policy or proceeds of annuity contract.
☐ 10. Disability income benefits.
☐ 11. Prepaid College Trust Fund or Medical Savings Account.
☐ 12. Other exemptions as provided by law. (explain)_____

I request a hearing to decide the validity of my claim. Notice of the hearing should be given to me at:

Address: _____

Telephone Number: _____

The statements made in this request are true to the best of my knowledge and belief.

_____          Date _____
        Defendant's Signature

The foregoing instrument was acknowledged before me this _____ day of _____, 20____ by

_____ who is personally known to me or who has produced _____

as identification and did ☐ / did not ☐ take an oath.

SWORN TO AND SUBSCRIBED BEFORE ME this _____ day of _____, 20____.

| HARVEY RUVIN<br>CLERK OF COURTS<br>( COURT SEAL) | BY:_____<br>DEPUTY CLERK / NOTARY PUBLIC | NOTARY PUBLIC, STAMP |
|---|---|---|

**Important - See reverse**

Clerk's web address: www.miami-dadeclerk.com

**LMS Packing Slip**

# Package ID: 1329364

| | |
|---|---|
| **Tracking Number:** | 424087619612 |
| **Package Recipient:** | Deborah McCutcheon |
| **Recepient Company:** | TATA Communications |
| **Recepient Address:** | 2355 Dulles Corner Blvd Suite 700 Herndon VA 20171-3402 USA |
| **Phone Number:** | 7036578413 |

## Package Contents:

| Transmittal Number | Case Number | Title of Action |
|---|---|---|
| 6869674 | 02-12475-CA-09 | Jeannette Fuller Hausler as Successor Personal Representative of the Estate of Robert Otis Fuller "Bobby Fuller", on behalf of Thomas Caskey as Personal Representative of the Estate of Lynita Fuller vs. The Republic of Cuba |



**CORPORATION SERVICE COMPANY**

# Notice of Service of Process

<div align="right">

null / ALL
**Transmittal Number: 6869674**
**Date Processed: 08/04/2009**

</div>

| | |
|---|---|
| **Primary Contact:** | Deborah A. McCutcheon<br>TATA Communications<br>2355 Dulles Corner Blvd<br>Suite 700<br>Herndon, VA 20171-3402 |

| | |
|---|---|
| **Entity:** | Tata Communications (America) Inc.<br>Entity ID Number 2628916 |
| **Entity Served:** | Tata Communications (America) Inc. |
| **Title of Action:** | Jeannette Fuller Hausler as Successor Personal Representative of the Estate of Robert Otis Fuller "Bobby Fuller", on behalf of Thomas Caskey as Personal Representative of the Estate of Lynita Fuller vs. The Republic of Cuba |
| **Document(s) Type:** | Garnishment/Withholding |
| **Nature of Action:** | Garnishment/Withholding |
| **Court:** | Miami-Dade County Circuit Court, Florida |
| **Case Number:** | 02-12475-CA-09 |
| **Jurisdiction Served:** | Florida |
| **Date Served on CSC:** | 08/04/2009 |
| **Answer or Appearance Due:** | 20 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Personal Service |
| **Plaintiff's Attorney:** | Roberto Maritinez<br>not shown |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

*CSC is SAS70 Type II certified for its Litigation Management System.*

2711 Centerville Road   Wilmington, DE 19808   (888) 690-2882   |   sop@cscinfo.com

IN THE CIRCUIT COURT OF
THE 11TH CIRCUIT IN AND FOR
MIAMI-DADE COUNTY,
FLORIDA

GENERAL JURISDICTION
DIVISION

CASE NO. 02-12475 CA 09

JEANNETTE HAUSLER as Successor
Personal Representative of the Estate of
ROBERT OTIS FULLER, ("BOBBY
FULLER") Deceased, on behalf of THOMAS
CASKEY as Personal Representative of the
Estate of LYNITA FULLER CASKEY,
surviving daughter of ROBERT OTIS
FULLER, The ESTATE OF ROBERT OTIS
FULLER, FREDERICK FULLER, FRANCES
FULLER, GRACE LUTES, JEANNETTE
HAUSLER, AND IRENE MOSS,

        Plaintiffs/Judgment Creditors,

vs.

THE REPUBLIC OF CUBA, FIDEL CASTRO
RUZ, individually and as President of the
State and Counsel of Ministers, Head of The
Communist Party and Commander-in-Chief of
the Military, RAUL CASTRO RUZ,
individually and as First Vice President of the
Counsel of State and Council of Ministers and
Head of the Cuban Revolutionary Armed
Forces, THE CUBAN REVOLUTIONARY
ARMED FORCES, and EL MINISTERIO DEL
INTERIOR,

        Defendants/Judgment Debtors,

vs.

TATA COMMUNICATIONS (AMERICA)
INC.,

        Garnishee.
_____/

Please Stamp and Return



Higer Lichter & Givner



GARNISHEE TATA COMMUNICATIONS (AMERICA) INC.'S
ANSWER AND AFFIRMATIVE DEFENSES
TO WRIT OF GARNISHMENT

Garnishee, TATA COMMUNICATIONS (AMERICA) INC. ("Tata Communications") answers the (second) Writ of Garnishment served upon it by Plaintiffs on August 24, 2009, as follows:

1.    At the time of this Answer and at the time of the service of the writ of garnishment (the "Writ of Garnishment") served upon it by Plaintiffs on March 4, 2009, and at all times between such dates, Tata Communications was not indebted to The Republic of Cuba; Fidel Castro Ruz; Raul Castro Ruz; the Cuban Revolutionary Armed Forces; El Ministerio Del Interio or any of their respective agencies or instrumentalities, or indebted to Empresa de Telecommunicaciones de Cuba, S.A. ("ETECSA").

2.    Tata Communications does not, at the time of service of the Writ of Garnishment or at the time of this Answer, or at any time between such dates, have in its possession or control, any tangible or intangible personal property of: The Republic of Cuba; Fidel Castro Ruz; Raul Castro Ruz; the Cuban Revolutionary Armed Forces; El Ministerio Del Interio or any of their respective agencies or instrumentalities, or of ETECSA.

3.    Tata Communications does not, at the time of service of the Writ of Garnishment or at the time of this Answer, or at any time between such dates, know of any other persons indebted to or who may be in possession or control of any

Higer Lighter & Givner

tangible or intangible personal property of The Republic of Cuba; Fidel Castro Ruz; Raul Castro Ruz; the Cuban Revolutionary Armed Forces; El Ministerio Del Interio or any their respective agencies or instrumentalities, or of ETECSA.

4.    The Writ of Garnishment raises complex issues of state and federal law. Tata Communications is obligated to pay its attorneys a reasonable fee and requests the Clerk of the Court to award Garnishee the statutory fee, as provided by Florida Statutes Section 77.28 for expenses incurred by it in defending the Writ of Garnishment.

## AFFIRMATIVE DEFENSES TO WRIT OF GARNISHMENT

### First Affirmative Defense

This garnishment proceeding is completely different from *Hausler v. Republic of Cuba*, Case No. 07-22375  CIV JORDAN ("*Hausler I*") in which the same Plaintiffs focused exclusively on funds due directly from Garnishee, AT&T Corp. ("AT&T"), to either the Cuban government or Empresa de Telecomunicaciones de Cuba ("EmtelCuba"). In *Hausler I*, there was no dispute that EmtelCuba was an agency or instrumentality of the Cuban government, and was therefore subject to garnishment for a judgment against the Cuban government.    *See generally Alejandre v. Telefonica Larga Distancia de Puerto Rico, Inc.*, 183 F.3d 1277, 1280-81 & n.7 (1999). Unlike *Hausler I*, Plaintiffs are seeking in this proceeding to garnish any funds due from Tata Communications, if any, to any of the named Defendants or their purported instrumentality, Empresa de Telecomunicaciones de Cuba, S.A., ('ETECSA')." *See* Writ of Garnishment [DE-1, Exhibit A].

Higer Lighter & Givner

Tata Communications has denied owing any funds to any of the named Defendants, to their agents or instrumentalities, or to ETECSA. Nonetheless, Plaintiffs have asserted in the Writ of Garnishment that they are entitled to a judgment in garnishment based on any alleged monies owed by Tata Communications to ETECSA – based on Plaintiffs' summary conclusion that ETECSA is an agent or instrumentality of the Cuban government.

First, Tata Communications owes no money to ETECSA. Second, even if it did, Plaintiffs have failed to demonstrate and cannot demonstrate that ETECSA is an instrumentality of the Cuban government such that any alleged monies owed to ETECSA – a non-party to Plaintiffs' Judgment – would be subject to garnishment for Plaintiff's judgment against Defendants. Under the applicable law, ETECSA is entitled to a presumption that it is a separate juridical entity from the Cuban Defendants and not subject to garnishment for a judgment against the Cuban Defendants. *See generally First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 627-28, 632-33 (1983) ("*Banco de Cuba*").

Significantly, Plaintiffs bear the burden of proving that ETECSA is not entitled to recognition as an entity separate from the Cuban Defendants. *See Alejandre*, 183 F.3d at 1285. The Eleventh Circuit has specifically held that these same Plaintiffs failed to make this showing. *See id.* at 1288-89. The law of the Supreme Court in *Banco de Cuba* and the Eleventh Circuit in *Alejandre* clearly dictate that Plaintiffs bear the burden of proof of the status of any entity they seek to garnish, including ETECSA. *See Banco de Cuba*, 462 U.S. at 627-28; *Alejandre*,

<u>Higer Lichter & Givner</u>

183 F.3d at 1285.

In sum, in order to garnish any sums owed by Tata Communications, if any, to ETECSA on the theory that ETECSA is an agency or instrumentality of a designated terrorist state, Plaintiffs must definitively prove that ETECSA is an agency or instrumentality of the Republic of Cuba. Any such proof, however, would be contrary to the United States issuance of licenses for payments to that entity. *See* Second Affirmative Defense. Moreover, based on the evidence elicited in *Alejandre*, that showing could not be made under current legal standards, because ETECSA was then 29.29% owned by a Dutch subsidiary of publicly traded Italian company; 12.03% by a Panamanian company; and 58.68% owned by three Cuban companies, which may or may not be owned or controlled by the Republic of Cuba. *See Alejandre*, 183 F.3d at 1281. If that ownership structure remains the same today, ETECSA is likely not an agency or instrumentality of the Republic of Cuba under the Supreme Court's 2003 decision in *Dole Food Co. v. Patrickson*, 538 U.S. 468 (2003). In *Dole*, the Court held that where a foreign state owns a majority of the shares of a corporate parent one or more tiers above a subsidiary, the subsidiary is not an instrumentality of the foreign state.[1]

Similarly, if Plaintiffs are seeking to garnish sums owed by Tata Communications to any other entities, they must prove that any such entities are an instrumentality of the Cuban government. Plaintiffs have failed to allege and

---

[1] To the extent *Alejandre* can be read to hold otherwise, it was based on the district court's finding that the Republic of Cuba owned or controlled the companies that together held a majority of ETECSA's shares. *See Alejandre*, 183 F.3d at 1283. That holding is no longer good law under *Dole*.

Higer Lichter & Givner

cannot allege or demonstrate that Tata Communications owes any monies to Defendants or their instrumentalities or to ETECSA. The Court should therefore dissolve Plaintiffs' Writ of Garnishment as failing to state a claim for which relief can be granted.

<div align="center">Second Affirmative Defense</div>

Any application of TRIA to Plaintiffs' Writ of Garnishment is limited to "blocked assets." TRIA § 201(a), codified at 28 U.S.C. § 1610 note; *see also Ministry of Defense & Support for the Armed Forces of the Islamic Republic of Iran v. Elahi*, 129 S. Ct. 1732, 1738 (2009) (TRIA "permitted a person with a terrorism-related judgment to attach an asset of the responsible 'terrorist' state to satisfy the judgment, '[n]otwithstanding any other provision of law,' *provided that the asset was a 'blocked asset.'"* (emphasis added) (alteration in original)). Tata Communications has not identified --- and is not in possession of any *blocked* assets due any of the Cuban Defendants or any other entities, including, without limitation, ETECSA.

The United States provides Tata Communications and other telecommunications carriers with a general "license" for the transfer of telecommunications traffic between the United States and the Republic of Cuba. *See* 31 C.F.R. §515.542(b). Moreover, the United States government expressly permits Tata Communications to make payments directly to the Republic of Cuba or its instrumentalities or ETECSA for Cuba-bound telecommunications traffic pursuant to a license issued by the Office of Foreign Assets Control ("OFAC") of the

<div align="center">Higer Lichter & Givner</div>

United States Department of the Treasury. *See generally* 31 C.F.R. §515.542(c). Where as here, the United States government authorizes Tata Communications to make payments to Cuba or its instrumentalities or ETECSA for Cuba-bound telecommunications traffic, it is axiomatic that "blocked assets" are not at issue here. TRIA specifically defines "blocked assets" to *exclude* "property that is subject to a license issued by the United States Government for final payment, transfer, or disposition by or to a person subject to the jurisdiction of the United States in connection with a transaction for which the issuance of such license has been specifically required by statute." TRIA § 201(d)(2)(B)(i), codified at 28 U.S.C. § 1610 note. Thus, even if Tata Communications owed any sums to ETECSA pursuant to OFAC license (which it does not), any such sums would not be blocked assets and would be specifically excluded from garnishment under TRIA.

The Court should therefore dissolve Plaintiffs' Writ of Garnishment as failing to state a claim for which relief can be granted.

### Third Affirmative Defense

Tata Communications owes no sums to Defendants or ETECSA. In the event Plaintiffs nonetheless garnish any sums owed by Tata Communications to third-parties, Tata Communications may be obligated to also make payment to any such third-party. The Court should therefore dissolve Plaintiffs' Writ of Garnishment against Tata Communications as it is barred as a matter of law.

Higer Lichter & Givner

### Fourth Affirmative Defense

The Writ of Garnishment is legally deficient, because foreign jurisdictions may not afford Plaintiffs' underlying default judgment full faith and credit. Tata Communications is therefore subject to a substantial risk of double payment. The Court should dissolve Plaintiffs' Writ of Garnishment as it is barred as a matter of law.

### Fifth Affirmative Defense

The Court lacks subject matter jurisdiction over the Writ of Garnishment if the underlying judgment was not entered in compliance with the provisions of the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602 – 1611 ("FSIA").

### Sixth Affirmative Defense

The Writ of Garnishment must comply with the provisions of FSIA, the Terrorism Risk Insurance Act of 2002, Pub.L.No 107-297, Title II, §201 (codified at 28 U.S.C. § 1610 note) and applicable law governing attachment.

### Seventh Affirmative Defense

Plaintiffs have failed to join necessary and indispensable parties to this proceeding, including, without limitation, the United States and the United States Department of Treasury.

### Eighth Affirmative Defense

The Court cannot exercise jurisdiction over assets located outside the State of Florida.

Higer Lichter & Givner

### Ninth Affirmative Defense

Pursuant to the United States Department of the Treasury's Cuban Asset Control Regulations, codified at 31 C.F.R. pt. 515, the United States government promotes and does not prohibit the free flow of information and telecommunications between the United States and Cuba. Plaintiffs' Writ of Garnishment violates or infringes upon the United States' public policy of permitting a free flow of information and telecommunications between the United States and the Republic of Cuba. The Court should dissolve the Writ of Garnishment as a violation of United States Public Policy.

### Tenth Affirmative Defense

Tata Communications is entitled to recover the costs and reasonable attorneys' fees incurred in responding to the Writ of Garnishment.

### DEMAND FOR GARNISHMENT DEPOSIT

Tata Communications demands payment of the garnishment deposit to undersigned counsel.

**WHEREFORE**, Garnishee Tata Communications (America) Inc. hereby requests that the Court enter an order dissolving the Writ of Garnishment and awarding Garnishee its reasonable attorneys' fees and costs, and ordering such additional relief as the Court deems appropriate.

Higer Lichter & Givner

Higer Lichter & Givner, LLP
18305 Biscayne Blvd., Suite 402
Aventura, Florida 33160
Telephone: 305-933-9970
Facsimile: 305-933-0998
*Attorneys for Garnishee*
*TATA Communications (America) Inc.*

By: _____
        Michael J. Higer
        Florida Bar No: 500798
        MHiger@HLGLawyers.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 19th day of August, 2009, a copy of Garnishee Tata Communications (America) Inc.'s Answer and Affirmative Defenses to Writ of Garnishment was forwarded by U.S. Mail to the parties and counsel on the attached service list.

_____
Michael J. Higer, Esquire
Florida Bar Number 500798

Higer Lichter & Givner

## SERVICE LIST

*Hausler v. The Republic of Cuba, v. TATA Communications (America) Inc.*
*(Garnishee)*

| | |
|---|---|
| Roberto Martinez, Esq.<br>Colson Hicks Eidson, P.A.<br>Attorneys for Plaintiffs<br>255 Aragon Avenue<br>Coral Springs, Florida  33134<br>Telephone:      (305) 476-7400<br>Fax:               (305) 476-7444<br>Email:             bob@colson.com | Alfonso J. Perez, Jr., Esq.<br>Rasco, Reininger, Perez, Esquenazi & Vigil,<br>P.A.<br>Attorneys for Plaintiffs<br>283 Catalonia Avenue; Second Floor<br>Coral Gables, Florida  33134<br>Telephone:   (305) 476-7100<br>Fax:             (305) 476-7102<br>Email:            aperez@rrpev.com |

Courtesy Copies will also be delivered by U.S. Mail to:

Ibasis, Inc.

Richard Tuschman, Esq.
Epstein Becker Green, P.C.
Wachovia Financial Center
200 South Biscayne Blvd.
Suite 4300
Miami, FL 33131
T:  (305) 579-3200
F:  (305) 579-3201
Email: rtuschman@ebglaw.com

Mark S. Flynn, Esq.
Chief Legal Officer & Corporate Secretary
20 Second Avenue
Burlington; MA 01803
Tel: (781) 505-7955
Email: mflynn@ibasis.net

Sprint Communications Co., L.P., Nextel
Retail Stores, LLC and Nextel South Corp.

Jonathan C. Koch, Esq.
Bush Ross, P.A.
1801 North Highland Avenue
Tampa, Florida  33602
T::(813) 204-6417
F: (813) 223-9620
Email: jkoch@bushross.com

Kirk Salzmann, Esq.
Counsel - Litigation
Sprint Communications Co., L.P.
Sprint Nextel d/b/a Nextel South Corp. and
d/b/a Nextel Retail Stores, LLC
2001 Edmund Halley Drive
Reston, VA 20191
T:  (703) 433-4610
kirk.salzmann@sprint.com

Higer Lichter & Givner

AT&T Corp

Albert L. Frevola, Jr.
Robin Corwin Campbell
350 East Las Olas Boulevard, Suite 1700
Fort Lauderdale, Florida 33301-4217
(954) 763-1200 – Telephone
(954) 766-7800 – Facsimile

SIDLEY AUSTIN LLP
Lynn A. Dummett
787 Seventh Avenue
New York, New York  10019
(212) 839-5300

Verizon Business Network Services, Inc.

Joshua D. Lerner, Esq.
Rossana Navarro Mena, Esq.
Rumberger, Kirk & Caldwell, P.A.
Brickell Bayview Centre; Suite 3000
80 Southwest 8th Street
Miami, FL  33130-3037
Tel: 305.995.5416 (Joshua D. Lerner)
Fax: 407.835.2018
jlerner@rumberger.com
T: (305) 358.5577 (Rossana Mena)
F: (305)371.7580
Email:  rmena@rumberger.com

Stacey L. Bennett, Esq.(service via US
MAIL)
Assistant General Counsel
Verizon Business
22001 Loudoun County Parkway
Ashburn, Virginia  20147
T:  (703) 886-2114
stacey.l.bennett@verizonbusiness.com

Telecom New Zealand USA Limited, Inc.
Courtesy Copy Served by US MAIL

Robert T. Wright, Jr., Esquire
Stroock & Stroock & Lavan, LLP
Attorneys for Telecom New Zealand USA
Ltd., Inc.
3100 Wachovia Financial Center
200  South Biscayne Boulevard
Miami, Florida  33131-5323
T:  305-358-9900
F:  305-789-9302
RWright@stroock.com

Anthony N. Briscoe (Officer/Director)
99 S. Lake Ave.
Suite 500
Pasadena, CA 91101

LD Telecom, Inc. and LD
Telecommunications, Inc.  Courtesy Copy
Served by US MAIL

Ted Miloch, Esq.
Katherine Fortuny, Esq.
Infante, Zumpano, Hudson & Miloch, LLC
500 South Dixie Highway
Suite 302
Coral Gables, FL 33146
T:  (305) 503-2990
F:  (305) 774-5908
Email:  Katherine.Fortuny@izhmlaw.com
Email: Ted.miloch@izhmlaw.com

Higer Lichter & Givner

Comcast of Miami, Inc. and Comcast IP
Phone II, LLC

Raoul G. Cantero, III, Esq.
White & Case LLP
Wachovia Financial Center
200 South Biscayne Boulevard
Suite 4900
Miami, Florida 33131-2352
Tel: (305) 371-2700
Fax: (305) 358-5744/5766
Email: rcantero@whitecase.com

AFJU

IN THE CIRCUIT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO. 02-12475 DIV. 04

JEANNETTE HAUSLER as
*Successor Personal Representative*
*of the Estate of* ROBERT OTIS FULLER,
("BOBBY FULLER"), *Deceased*, on behalf
of THOMAS CASKEY as Personal
Representative of the Estate of LYNITA
FULLER CASKEY, surviving daughter
of ROBERT OTIS FULLER, The
ESTATE OF ROBERT OTIS FULLER,
FREDERICK FULLER, FRANCES
FULLER, GRACE LUTES, JEANNETTE
HAUSLER, AND IRENE MOSS

       Plaintiffs,

vs.

THE REPUBLIC OF CUBA, FIDEL CASTRO
RUZ, individually and as President of the
State and Council Of Ministers, Head of
the Communist Party and Commander-in
Chief of the Military, RAUL CASTRO RUZ,
individually and as First Vice President Of
the Council of State and Council of Ministers
and Head of the Cuban Revolutionary
Armed Forces, The CUBAN
REVOLUTIONARY ARMED FORCES,
and EL MINISTERIO DEL INTERIOR,

       Defendants.
_____/



## AMENDED FINAL JUDGMENT

THIS CAUSE came before the Court for Non Jury trial on Wednesday,

December 13, 2006, and after receiving extensive evidence, this Court hereby rules as

follows:

### I. CAUSE OF ACTION

This is an action brought by Jeannette Hausler, as Personal Representative of

the Estate of Robert Otis Fuller ("Bobby Fuller"), Deceased, pursuant to the Foreign

Sovereign Immunities Act (FSIA) of 1976, 28 U.S.C. §§ 1602-1611, the Anti-Terrorism

GARNISHEE- AT&T
EXHIBIT "C"



EXHIBIT
C

FULLER/HAUSLER v. The Republic of Cuba, etc. et al.,    CASE NO. 02-12475 DIV. 04

and Effective Death Penalty Act of 1966 ("AEDPA") 28 U.S.C. . § 1605 (a)(7), and the Torture Victim Protection Act of 1991, 28 U.S.C.A. . § 1350, arising out of the Defendants' extra-judicial torture and killing of Bobby Fuller on October 15th and 16th, respectively, 1960.

The FSIA establishes State and Federal Court jurisdiction over foreign states and their officials, agents, and employees in certain enumerated instances. Specifically, the FSIA eliminates the sovereign immunity of foreign states over any claim that may be brought against a designated state sponsor of terrorism (and/or its agents and instrumentalities) under federal law, under governing state law, under governing foreign law, or under international law establishing a cause of action for acts of state-sponsored terrorism "in which money damages are sought against a foreign state for personal injury or death that was caused by an act of *torture, extra-judicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources...for such an act if such act or provision of material support is engaged in by an official, employee or agent of such foreign state while acting within the scope of his or her office, employment or agency..." 28 USC § 1605 (a)(7).* FSIA further provides that "an official, employee or agent of a foreign state designated as state sponsor of terrorism... shall be liable to a United States national or the national's legal representatives for personal injury or death caused by acts...for which the Courts of the United States may maintain jurisdiction..." 28 USC § 1605, Civil Liability for Acts of State Sponsored Terrorism. The Defendants, despite being properly being served with process pursuant to 28 USC § 1608, have failed to answer or enter an appearance in this matter, and Defaults were entered against the Defendants, The Cuban

2

<u>FULLER/HAUSLER v. The Republic of Cuba, etc. et al.,   CASE NO. 02-12475 DIV. 04</u>

Revolutionary Armed Forces, Fidel Castro Ruz and Raul Castro Ruz on June 28, 2006;

against The Republic of Cuba on September 2, 2006 and the Defendant, The Ministry

of the Interior on October 3, 2006, pursuant to 28 USC § 1608 (e) and the applicable

Florida Rule of Civil Procedure.  This matter was set for non-jury trial as the FSIA

requires that a Default Judgment against a foreign state be entered only after a Plaintiff

"establishes his claim or right to relief by evidence that is satisfactory to the Court." 28

USC § 1608 (e). See also *Flatow v. The Islamic Republic of Iran*, et al., 999 F. Supp. 1,

at 6 (1998).

Defendants have failed to contravene the evidence presented by Plaintifs

demonstrating that the conduct set forth herein is actionable under standards set by

federal, state and international law.  In particular, Plaintiff's have demonstrated to the

Court's satisfaction that extra-judicial torture and killing, for purposes of the FSIA and

the AEDPA are defined in Section 3 of the Torture Victim Act of 1991, 28 USC § 1350.

Section 3 (a) Defines Extra-Judicial Killing as;

> "...a deliberated killing not authorized by a previous judgment pronounced
> by a regularly constituted court affording all of the judicial guarantees which
> are recognized as indispensable by civilized peoples..."

The definition of Extra-Judicial Killing used in the Torture Victim's Protection Act

of 1991, mirrors word for word the language of Part I, Article III, Section 1(d) of the

Geneva Convention adopted on August 12, 1949, to which The Republic of Cuba was a

signatory, which states in part;

> "...the following acts are and shall remain prohibited at any time and at any place
> whatsoever...
>
> (d) The passing of sentences and the carrying out of executions without
> previous judgment pronounced by a regularly constituted Court affording   all the
> judicial Guarantees which are recognized as indispensable by civilized peoples."

3

FULLER/HAUSLER v. The Republic of Cuba, etc, et al.,  CASE NO. 02-12475 DIV. 04

In defining what constitutes a "previous Judgment pronounced by a regularly
constituted court affording all the Judicial guarantees that are recognized as
indispensable by civilized peoples, " Section 3 of the Geneva Convention, "Judicial
Proceedings," offers relevant guidance:

## III Judicial Proceedings

### Article 99

No moral or physical coercion may be exerted on a prisoner of war in order to
induce him to admit himself guilty of the act of which he is accused.

No prisoner of war may be convicted without having had an opportunity to
present his defense and the assistance of a qualified advocate or counsel.

### Article 101

If the death penalty is pronounced on a prisoner of war, the sentence shall not
be executed before the expiration of a period of at least six months from the date
when the Protecting Power receives, at an indicated address, the detailed
communication provided for in Article 107

## Section 3(b) of the Torture Victim Protection Act of 1991, defines torture as:

"...any act, directed against an individual in the offender's custody or physical
control by which severe pain or suffering... whether physical or mental, is
intentionally inflicted on that individual for such purposes as obtaining from that
individual or a third person information or a confession, punishing that individual
for an act that individual or a third person has committed or is suspected of
having committed, intimidating or coercing that individual or third person, or for
any reason based on discrimination of any kind."

The facts as more specifically set forth below clearly demonstrate that Bobby
Fuller was not afforded "the judicial guarantees which are recognized as indispensable
by civilized peoples," as those guarantees are defined under the Geneva Convention
and the AEDPA, and that he was the victim of both Torture and Extra-Judicial Killing
perpetrated by the Defendants, both individually and collectively, actionable under

4

FULLER/HAUSLER v. The Republic of Cuba, etc. et al., CASE NO. 02-12475 DIV. 04

federal, state and international law.

## II. JURISDICTION

This Court has jurisdiction over the subject matter of this cause pursuant to the

express terms of 28 USC § 1605(a) which provides in part:

A foreign state shall not be immune from the jurisdiction of courts of the United
States or of the States in any case-

(7) not otherwise covered by Paragraph (2), in which money damages
are sought against a foreign state for personal injury or death that was caused
by an act of torture, extra-judicial killing,…, or the provision of material support
or resources…for such an act if such act or provision of material support is
engaged in by any official, employee or agent of such foreign state while acting
in the scope of his or her office, employment or agency, except that the Court
shall decline to hear a claim under this paragraph-

(A) If the foreign state was not designated as a state sponsor of
terrorism under 6(j) of the Export Administration Act of 1979…at
the time the act occurred, unless later so designated as a result of
such act; (emphasis added). ·

This Court expressly finds that all statutory criteria for the exercise of jurisdiction

under this statute over a claim against Defendant Cuba and the remaining Defendants

(who are agents or instrumentalities of Defendant Cuba) have been established by

evidence satisfactory to the Court. In particular, the Court finds that Defendant, Cuba,

which was designated to be a state sponsor of terrorism in 1982, under the terms of 56

(j) of the Export Administration Act of 1979, at least in part by reason of the acts of

terrorism described herein including the torture and extra-judicial killing of Bobby

Fuller, is subject to suit in any State Court of the United States, pursuant to the

provisions 28 USC § 1605. See also *Ring v. Socialist Peoples Libyan Arab*, 995

F.Supp.325 (ED NY 1998); and *Weininger v. Fidel Castro*, et al (SD NY 2006) 05 CIV

7214 (VM).

## III. REMEDY APPLIED RETROACTIVELY

5

FULLER/HAUSLER v. The Republic of Cuba, etc. et al.,   CASE NO. 02-12475 DIV. 04

Pursuant to 28 USCA §1605, the remedies sought in this action apply retroactively for the purposes of establishing subject matter and personal jurisdiction. As congress expressly directed the retroactive application of 28 USC §1605(a)(7) in order to further a comprehensive counter-terrorism initiative by the legislate branch of government, the event complained of herein, although occurring prior to the enactment of the Anti-Terrorism Effective Death Penalty Act of 1996 does provide a basis for subject matter jurisdiction. See also Flatow v. The Islamic Republic of Iran, et al., 999 F. Supp 1 (USDC DC 1998).

## IV.  STATUTE OF LIMITATIONS

This cause of action brought pursuant to 28 USC §1605 (a) (7) has been brought within the applicable statute of limitations.  28 USC § 1605 (f) states:

> No action shall be maintained under Section (a) (7) unless the action is commenced not later than 10 years after the date on which the cause of action arose.  "All principles of equitable tolling, including the period during which the foreign state was immune from suit, shall apply in calculating this limitation."

Given the equitable tolling mandated by the subject legislation, this cause of action has been brought within the applicable time frame.  In fact, the Court in Flatow, supra, at 23, extinguished any doubt as to this conclusion when it stated, "This Court therefore concludes as a matter of law that the earliest possible date for the statute of limitations to expire for any action brought pursuant to 28 USC 1605(a)(7) and 28 USC 1605 will be April 24, 2006."  Given the foregoing, and the fact that this cause of action was filed prior to May 15, 2002, the claims herein are not barred by the statute of limitations.

## V. FINDINGS OF THE FACTS

6

FULLER/HAUSLER v. The Republic of Cuba, etc. et al.,   CASE NO. 02-12475 DIV: 04

This Court having heard clear and convincing evidence hereby makes the following
findings of fact:

## A. FULLER FAMILY HISTORY:

At the turn of the century, 1903, Bobby's grandfather, Albin Jewett and his
mother, Jennie (then 3 years old) moved from Massachusetts to Holguin, Cuba. Their
family lineage could be traced back to the Mayflower and in fact, Jennie, was a proud
member of the Daughters of the American Revolution until her death at age 99. The
Jewett family purchased approximately 10,000 acres of prime real estate and
established a plantation and thriving businesses, including lumber enterprises, saw mill,
live stock and dairy cattle and sugarcane operations. Their property was named
"Lewiston" due to other family connections to New England. In 1925, William Otis
Fuller married Jennie Jewett after which he took over the operations of Lewiston.
William and Jennie Fuller had eight children, four boys and four girls. In addition to
their thriving plantation and business operations in Cuba, the Fullers also possessed
and maintained a home in Miami, Florida where the boys attended High School. The
girls all attended a boarding school in Massachusetts. However, Lewiston was "home"
to Jennie, and William Fuller and all of the children, especially Bobby, the eldest male,
who in fact shortly prior to his death had inherited the task of running the Lewiston
Plantation and associated business enterprises. Bobby's father, William Fuller
possessed a Harvard education and a University of Miami law degree. In short, the
Fullers were recognized as a highly successful and civic minded family in both Cuba
and the United States.

7

FULLER/HAUSLER v. The Republic of Cuba, etc. et al.,   CASE NO. 02-12475 DIV. 04

**B. BOBBY FULLER:**

Bobby Fuller was born on the Plantation in Lewiston, Cuba on May 11, 1934. From birth he possessed dual citizenship in both Cuba and the United States and remained an American citizen through the date of his death. Bobby attended and graduated from Miami Senior High School in 1952. Shortly thereafter, he fell in love with and was married to Maretta June Wixsom. After the commencement of the Korean conflict, Bobby enlisted in the United States Marine Corps and served honorably in Korea from March 23, 1954 through March 22, 1957. Lynita Fuller, Bobby's beautiful baby girl, was born while he was serving on foreign soil on October 29, 1954. Unfortunately, after Lynita's birth, while Bobby was still serving his country in Korea, he learned of his wife's infidelity which lead to the couple's divorce in 1956. In his absence, and in light of his wife's difficulties, it was agreed that Lynita's maternal grandparents would maintain custody over her until such time as Bobby had obtained his discharge and put certain family matters in order, including the family's possessions, home and business operations in Cuba, which was feeling the effects of political turmoil which ultimately lead to the Fidel Castro lead revolution. In fact, after his discharge, Bobby spent most of his time in Cuba having inherited the reigns of control of their various businesses from his father. Due to the existing turmoil, Bobby allowed his daughter to remain in the custody of his grandparents as he did not think it was safe for her in his beloved, Lewiston.

**C. BOBBY FULLER'S "TRIAL, TORTURE AND EXECUTION":**

By December of 1959, the communist revolution was in full force on the island of Cuba. The sanctity of personal holdings and the survival of existing business

8

enterprises such as the Fullers' were threatened.  Bobby's father, William, was repeatedly harassed and threatened by members of the Castro led revolutionary movement.  On one such occasion, armed revolutionaries came to the Lewiston plantation, placed a noose around William Fuller's neck and threatened to hang him due to his ties to America and their concerns over his loyalty to the "Revolution."  After going to his father's side and protesting such treatment, a gun was put to Bobby's head and his life was threatened as well.  Thereafter, William Fuller returned to Miami.  However,  Bobby stayed in Lewiston to look over and protect his mother and the Fuller family properties and operations.  After a short visit to Miami, Bobby returned in early October of 1960 to the family Lewiston plantation.  Shortly after his arrival, he was arrested by Castro agents and charged with counterrevolutionary activities against the Castro regime.  Like most other prisoners of the regime, Mr. Fuller was kept in solitary confinement except for those periods of time that he was interrogated and/or tortured, until such time as he capitulated by signing a prepared confession.

By 4:00 P.M. on the day of his arrest, October 15, 1960, Bobby was escorted to a military run tribunal where he was charged, tried and sentenced to death within a period of only a few minutes.  Those present described a "Roman circus atmosphere."  Bleachers were set up to allow for hundreds of pro-Castro supporters to participate by yelling and screaming, "PAREDON, PAREDON"  (TO THE WALL, TO THE WALL!! referencing a location for firing squad executions).  Other exclamations of, "DEATH TO THE AMERICANS, DEATH TO THE YANKEES!!" were also rampant.  It was in this bloodthirsty atmosphere that Bobby, with several others, was escorted in chains down an aisle and ordered to stand before the tribunal encompassed purely of Castro regime

9

FULLER/HAUSLER v. The Republic of Cuba, etc. et al.,  CASE NO. 02-12475 DIV. 04

members. Mr. Fuller was not allowed to sit. Mr. Fuller was not allowed to call any witnesses. Mr. Fuller was not provided with effective defense counsel as evidenced by the Affidavit of Richard Jewett, an eyewitness to the proceedings. It was in a period of approximately 15 minutes that Bobby's trial was completed, he was sentenced to death by a firing squad and his appeal was denied. After these inhuman, sham proceedings, Bobby was immediately removed to a jail cell where he sat in solitary confinement awaiting his execution by firing squad. After persistent protests, his mother Jennie Fuller was allowed a very short visit with him, at which time he professed his love and affection for her, his father, his siblings and his daughter, Lynita. As the five minute period evaporated, Bobby Fuller handed over his only keepsake, a ring, with a request that it be given to his brother Freddy who would know what to do with it.

In the early morning hours of October 16th, Bobby Fuller was removed from his cell and taken to a location where his blood was drained. Thereafter, he was driven to Santiago de Cuba, where he was executed by firing squad. Notwithstanding his mother's pleas to have his body returned to her for burial at the family cemetery in Lewiston, Bobby Fuller's remains were thrown in an unmarked ditch at an unknown location shared by countless other victims of the firing squads. To date, the whereabouts of Bobby's remains have never been disclosed. Bobby Fuller was 25 years old and his execution took less than 24 hours after his arrest and within two weeks of his loving daughter's sixth birthday.

After the proceedings, The United States State Department filed a formal protest, that was personally delivered to the Cuban Foreign Ministry by the United States Charge d'Affaires, Daniel Braddock, which denounced the proceedings and charged

<u>FULLER/HAUSLER v. The Republic of Cuba, etc. et al.,   CASE NO. 02-12475 DIV. 04</u>

that the Cuban authorities had "failed to observe basic civilized standards." The United

States protest described the events as having been carried out in a "Roman Circus

atmosphere," and personally charged Premier Fidel Castro's regime as being guilty of

"inhuman behavior," in refusing to release Bobby Fuller's body to his relatives for

humane burial.

"The aforementioned facts clearly demonstrate that Bobby Fuller was not

afforded the "judicial guarantees which are recognized as indispensable by civilized

peoples," and that he was the subject of the acts of terrorism as described herein of

both torture and extra-judicial killing as defined under 28 USC § 1605(a)(7). The

violations of these guarantees include, but are not limited to the following: "

a) Mr. Fuller and his family received inadequate notice of the trial as is well established by fact that no more than 24 hours elapsed between his arrest and summary execution.

b) Prior to this sham of a court proceeding, Mr. Fuller was questioned extensively without the presence of an attorney.

c) Mr. Fuller was held in solitary confinement prior to his "trial" during which time he was extensively interrogated and tortured to the point where he capitulated by signing a prepared confession.

d) Mr. Fuller was not afforded the opportunity of effective legal counsel of his own choosing.

e) Mr. Fuller was not afforded adequate time to prepare a defense, particularly in light of the severity of the charges and potential penalties

f) In fact, Mr. Fuller was denied the opportunity to provide a defense.

g) The tribunal did not disclose its intent to seek the death penalty prior to trial, and if fact, assured him that it would not be imposed in order to obtain his confession.

h) Mr. Fuller was taunted and humiliated for being an American by the prosecutor, the tribunal and the frenzied mob present to witness the spectacle.

11

i)    Mr. Fuller was denied access to family members prior to his death and his remains were disposed of in a manner reflecting the complete absence of any humanity.

This Court further finds that Defendants, Fidel Castro Ruz, Raul Castro Ruz, the Cuban Revolutionary Armed Forces and El Ministerio Del Interior were at all times material hereto, inclusive of the torture and extra-judicial killing of Bobby Fuller, acting as agents and instrumentalities of the Republic of Cuba in the implementation of policy at the operational level in such a manner as to mandate the award of both compensatory and punitive damages. The Court further finds that the Defendant Republic of Cuba supervised, directed benefited from and is legally responsible for the actions of its agents and instrumentalities as set forth in this Judgment.

D. **COMPENSATORY DAMAGES**:

The amendments to the FSIA, 28 USC § 1605(a)(7) and 28 USCA § 1605, as well as governing federal, state and international standards, permit the recovery of compensatory damages. As enumerated in those amendments, these damages may include economic losses resulting from the death of Mr. Fuller, survival damages, including the pain and suffering of the decedent between the time of his arrest and his illegal execution, and solatium, which is inclusive of mental anguish, loss of the decedent's love, affection, care, attention, companionship, comfort and protection, bereavement, grief and hurt feelings sustained by any family member with a "close emotional relationship with the decedent," including siblings. See *Flatow, supra, at 30-32.* Relevant decisions agree that the trial Court is provided broad discretion and may take into consideration a wide variety of factors, including the decedent's achievements and plans for the future which would have affected the claimants. *Flatow, supra, at 32.* Furthermore, it has been recognized that "the malice associated with terrorist attacks

12

FULLER/HAUSLER v. The Republic of Cuba, etc. et al.,   CASE NO. 02-12475 DIV. 04

transcends even that of pre-meditated murder. The intended audience of a terrorist attack is not limited to the families of those killed and wounded...but in this case, the American public...the terrorist intent is to strike fear not only for one's own safety, but also that of friends and family and to manipulate that fear in order to manipulate political objectives. Thus, the character of the wrongful act itself increases the magnitude of the injury. It does demand a corresponding increase in compensation for increased injury."

In this matter, this Court has heard compelling evidence concerning the significant losses sustained by the Plaintiffs herein, including the following:

a) The economic losses sustained by the Estate of Robert Otis Fuller.

b) The pain and suffering sustained by Robert Otis Fuller between the time of his arrest and his illegal and summary execution.

c) The solatium sustained by his siblings, Frederick Fuller, Frances Fuller, Grace Lutes, Jeannette Hausler and Irene Moss.

d) The solatium of Robert Otis Fuller's daughter, Lynita Fuller, of incomprehensible proportions.

### 1. Economic Loss:

In support of the claim for economic loss, the Plaintiffs presented the expert testimony of Dr. Octavio Verdeja, Jr., a Certified Public Accountant, an expert in business valuation, who has over the years provided calculations for businesses transported from Cuba to the United States. Mr. Verdeja calculated the economic losses suffered by the Plaintiffs as a result of Bobby Fuller's death by using two alternative means. Under Method I, Mr. Verdeja calculated the probable current value of Mr. Fuller's Estate had Bobby Fuller lived to pursue the types of business interests he had successfully maintained through his death. Specifically, Mr. Verdeja calculated the present money value of Mr. Fuller's business enterprises including dairy milk

13

<u>FULLER/HAUSLER v. The Republic of Cuba, etc. et al., CASE NO. 02-12475 DIV. 04</u>

production, beef, piso (the leasing of land for cattle grazing), lumber and sugar cane production. Under method I, the present money value of the economic loss sustained by the Plaintiffs in this case amounts to $88,549,377.00. Under Method II, Mr. Verdeja calculated the probable present money value of Mr. Fuller's Estate, had he lived without regard to the types of business interests he had successfully pursued prior to his death. Specifically, Mr. Verdeja calculated the present money value of the income and savings that Mr. Fuller would have generated, given the resources available to him at the time of his death. Under this methodology, the present money value of the loss sustained by the Estate was $50,995,962.00.

This Court finds that even the most conservative view of the evidence presented justifies a substantial economic award. Accordingly, compensatory damages for economic losses resulting from the death of Bobby Fuller are hereby awarded in the amount of <u>Sixty Five Million Dollars ($65,000,000.00).</u>

### 2. <u>The Pain and Suffering sustained by Bobby Fuller prior to execution</u>

With regard to this item of damage, the Court had the benefit of both lay and the expert testimony of Claudia Edwards, Ph.D., which depicted severe mental pain and anguish experienced by Bobby Fuller between the time of his arrest and ultimate execution, including but not limited to the horror of standing before a biased tribunal in a setting described by diplomatic onlookers as a "Roman Circus," undergoing a sham of a trial and being sentenced to death, all in the presence of his mother, being placed in solitary confinement without any opportunity to speak to family with the limited exception of a heart rendering 5 to 10 minutes with his mother, being removed to an infirmary where his blood was drained and then ultimately walked before a firing squad

14

<u>FULLER/HAUSLER v. The Republic of Cuba, etc. et al.,   CASE NO. 02-12475 DIV. 04</u>

for his execution.

Based upon the lay and expert testimony received, and after contemplation of the circumstances surrounding the last tragic moments of Mr. Fuller's life, damages are hereby awarded by this Court to Mr. Fuller's Estate for this element of damage in the amount of <u>Five Million Dollars ($5,000,000.00).</u>

### 3. <u>Solatium of Siblings, Frederick Fuller, Frances Fuller,Grace Lutes, Jeannette Hausler and Irene Moss</u>

This Court received compelling evidence concerning the close emotional relationship between Bobby Fuller and his beloved brothers and sisters, Frederick Fuller, Frances Fuller, Grace Lutes, Jeannette Hausler and Irene Moss. It is clear from the evidence presented that each of the siblings suffered a devastating and permanent injury as a result of the torture and extra-judicial killing of their brother, Bobby Fuller. This Court also finds that their loss arising from their brother's torture and extra-judicial killing was heightened by the inhumane denial of the Defendants to return Mr. Fuller's remains to his family for proper burial and the establishment of a proper and permanent memorial. Although this Court heard evidence in profound detail concerning each siblings painful reaction to the events and the irreparable harm to them as a result of their brother's death, this Court finds it impossible to say that one sibling suffered anymore than another, and accordingly, compensatory damages for the pain and suffering of Bobby Fuller's siblings are hereby awarded as follows:

Frederick Fuller <u>Four Million Dollars ($4,000,000.00)</u>

Frances Fuller <u>Four Million Dollars ($4,000,000.00).</u>

15

## FULLER/HAUSLER v. The Republic of Cuba, etc, et al., CASE NO. 02-12475 DIV. 04

Grace Lutes    Four Million Dollars ($4,000,000.00),

Jeannette Hausler   Four Million Dollars ($4,000,000.00)

Irene Moss    Four Million Dollars ($4,000,000.00)

### 4. Solatium of Robert Otis Fuller's Daughter, Lynita Fuller:

With regard to Lynita Fuller, this Court heard extraordinary lay and expert testimony reflecting the devastating impact of the absence of Bobby Fuller on Lynita's life. The evidence detailed not only the decedent's achievements, but the plans for his future with Lynita. This Court has also been impressed by the testimony reflecting that as a result of Bobby Fuller's death, Lynita was isolated from the entire Fuller family and as a result lost the extensive benefits that would have been hers, in the form of love, companionship and nurturing. In the absence of Bobby Fuller's presence, the evidence was that Lynita was turned over to her maternal grandparents, both of whom were alcoholics and ignored the duties entrusted to them as her custodians, and in fact, subjected her to abusive treatment and circumstances. In addition, this Court also was struck by evidence to the effect that Lynita's mother was also an alcoholic who subjected her daughter to physical and sexual abusive perpetrated by her boyfriend, and then, Lynita's stepfather. As described by Dr. Claudia Edwards, an expert in psychological trauma, Lynita sustained serious and irreparable psychological harm manifesting itself in severe loss of self-esteem and self-worth, as well as isolation and significant depression, which drastically impaired her ability to enjoy or even pursue the happiness to which she was entitled. In short, this Court finds from the evidence presented that Bobby Fuller's torture and summary execution had an devastating impact upon his daughter Lynita and compensatory

16

FULLER/HAUSLER v. The Republic of Cuba, etc. et al.,   CASE NO. 02-12475 DIV. 04

damages are hereby awarded as follows:

Solatium of LYNITA CASKEY FULLER: Ten Million Dollars ($10,000,000.00).

## E. PUNITIVE DAMAGES

"The purpose of Punitive Damages, as the name implies is to punish wrongful conduct—to prevent its repetition by the offender and to deter others who might choose to emulate it...The victim to whom the award is made thus stands as a surrogate for civilized society in general; the victim is made more than whole in order that others may be spared a similar injury....Yet another reason to award punitive damages in this particular case is to vindicate the interest of society at large in the collection and dissemination of complete and accurate information about world conflicts." *Anderson v. The Islamic Republic of Iran*, 90 F. Supp 2d 107 (USDC DC 2000). Therefore, in order to arrive at the proper punitive award and to serve the aforementioned purposes of the subject legislative enactments, it was important to gain an understanding of the Defendants' terrorist behavior, and support thereof, over time, in order to gage its repetitive nature and assess the proper deterrent. In the present matter, the evidence presented to this Court, in credible detail, demonstrated the Defendants' persistent, undeterred commitment to International terrorist activity and the sponsorship thereof.

The facts supporting the punitive claim are set forth in the Plaintiffs' Second Amended Complaint 34 through 56, *(Pages 9 through 15)*, all of which are deemed admitted or otherwise established as a matter of law pursuant to the Defendants' default in this case. The punitive claim in this case was also supported by the testimony of lay and expert testimony, particularly Dr. Jaime Suchlicki which corroborated those facts set forth in the Second Amended Complaint and further

17

expanded upon the Defendants' role in the arena of international terrorism. Unbeknownst to most Americans, the Defendants in this cause, have engaged in and provided uninterrupted support of international terrorism for more than four decades, dating at least to the time of the death of Bobby Fuller. It is by no coincidence that the Republic of Cuba was one of the original designated state sponsors of terrorism and has remained on that list ever since. As early as the 1960's the Defendants established training camps in and around Havana, Cuba, utilized by members of various international terrorist organizations, including the PLO, Hamas and Hezbolah. In January of 1966, Fidel Castro and the other Defendants sponsored and hosted the "Tri-Continental Conference," in Havana, Cuba, which had the stated purpose of devising a global strategy against "American and Western imperialism."

This meeting was attended by a plethora of terrorist groups including those from Africa, the Middle East, Central and South America. In so doing, the Defendants were credited with establishing the "first" international terrorist network and support structure. In conjunction with that conference, the Defendants facilitated the publication of the "Minimanual of the Urban Guerrilla," which encouraged international terrorist acts and provided step-by-step instructions as to how to carry out such activities as bomb building, kidnapping, sabotage and hostage taking. This guideline has no doubt been used by many, if not all, of the terrorists groups posing a threat to the United States and civilized society, including the PLO, Hamas, Hezbolah, ETA and Los Macheteros. September 11, 2001 was not the first terrorist attack on American soil bringing death to American citizens. We need to look only at the actions of the Macheteros, a terrorist group recognized by the F.B.I. and the US Department of State, to have been trained

18

<u>FULLER/HAUSLER v. The Republic of Cuba, etc. et al.,   CASE NO. 02-12475 DIV. 04</u>

and financed by the Defendants in this cause, as an example of this unfortunate, but little known fact. Amongst their "credits" of attacks upon the United States, we can include the following:

a) The 1979 Ambush of a United States Navy bus killing two U.S. sailors and wounding nine.

b) The 1983 armed robbery of a Wells Fargo depot in West Hartford, Connecticut in which they absconded with 7.1 million dollars. The second largest cash robbery in American history. 14 of the 19 members of that group were arrested and convicted. Unfortunately, the leader of the group, Victor Gerena escaped and is known by the F.B.I. to be living in Cuba, harbored by the Defendants. The F.B.I. specifically uncovered that this operation was financed by the Defendants, and in fact, traced at least 2 million dollars of the proceeds to Havana. Mr. Gerena is still on the F.B.I.'s Most Wanted Listed.

The aforementioned matters are but a small example of the Defendants' willful, wanton and intentional crimes against civilized society. As reflected in the Second Amended Complaint, and corroborated and expanded upon by the trial testimony in this case, the Defendants have provided training, intelligence, financial support and otherwise sponsored international terrorist groups, including but not limited to the E.L.N., E.T.A. F.A.R.C., HAMAS, HEZBOLAH, I.R.A., LOS MACHETEROS, M19, P.L.O., TUPAMAROS, and TUPAC AMARU. In fact, the PLO and several other of these organizations have long maintained headquarters in Havana. The F.B.I. have identified no less than 77 known fugitives believed to be harbored by the Defendants in Cuba including, Joan Shesimard a/k/a Asatah Shakur, one of the United States' most wanted fugitives for killing a New Jersey State Trooper in 1973, Charlie Hill, a member of the Republic of the New Africa Movement wanted for the hijacking of TWA 727 and the murder of a New Mexico State Trooper, amongst many, many others.

19

FULLER/HAUSLER v. The Republic of Cuba, etc. et al.,   CASE NO. 02-12475 DIV. 04

As reflected by the State Department's annual review of states sponsoring terrorism, the Defendants engagement and support of international terrorism has continued through the present date unabated. We need only turn to Castro's statements at Tehran University in 2001, where he proudly proclaimed, *"Iran and Cuba, in cooperation with each other, can bring America to its' knees,"* and the US Department of State's acknowledgments of Havana's close ties and support of Hamas and Hezbolah in locations as proximal as the tri-border area to understand the unrelenting motive of the Defendants to bring terrorism to the United States and to strike fear in the hearts of its citizenry.

In summation, the testimony and documentary evidence presented in this case conclusively establish that Fidel Castro, Raul Castro, The Cuban Revolutionary Armed Forces and the Ministry of the Interior acting in the scope of their capacity as agents and/or instrumentalities of the Republic of Cuba have engaged in repetitive and undeterred use and support of international terrorism, inclusive of torture and extra-judicial killings (dating at least to, and including, the extrajudicial killing of Bobby Fuller), which mandates a powerful response in the form of punitive damages. In accordance therewith, punitive damages are hereby awarded against FIDEL CASTRO RUZ, individually, and as President of the State and Counsel of Ministers, Head of the Communist party and Commander in Chief of the Military, RAUL CASTRO RUZ, individually, and as First Vice President of the Counsel of State and Counsel of Ministers and head of the Cuban Revolutionary Armed Forces, THE CUBAN REVOLUTIONARY ARMED FORCES,  EL MINISTERIO DEL INTERIOR and THE REPUBLIC OF CUBA to which the actions of its agents and instrumentalities are

20

FULLER/HAUSLER v. The Republic of Cuba, etc. et al.,  CASE NO. 02-12475 DIV. 04

imputed, punitive damages in the amount of:  Three Hundred Million Dollars ($300,000,000.00).

IT IS HEREBY ORDERED AND ADJUDGED that a Final Judgment is hereby GRANTED on behalf of JEANNETTE HAUSLER, as Personal Representative of the Estate of Robert Otis Fuller (BOBBY FULLER), Deceased, and against the Defendants, THE REPUBLIC OF CUBA, FIDEL CASTRO RUZ, RAUL CASTRO RUZ, THE CUBAN REVOLUTIONARY ARMED FORCES AND EL MINISTERIO DEL INTERIOR, jointly and severally as follows:

1. For Economic losses due the Estate in the amount of : Sixty Five Million Dollars ($65,000,000.00).

2. For non-economic compensatory damages, the amount of: Thirty Five Million Dolairs ($35,000,000.00).

3. Punitive damages in the amount of: Three Hundred Million Dollars ($300,000,000.00).

The sum execution may issue forthwith against the said Defendants and any of their assets wherever situated.  This Court will retain jurisdiction to enforce this judgment or any matters pertaining thereto.  This Judgment shall bear interest at a rate of 9 % percent per year from date of entry until satisfied.

DONE AND ORDERED in Miami-Dade County, Florida this 19 day of _____ Jan _____, 2007.

THOMAS S. WILSON, JR.
CIRCUIT COURT JUDGE

Copies furnished for:
JOHN S. GAEBE, ESQ.
ALFONSO PEREZ, ESQ.
ROBERTO MARTINEZ, ESQ.
RON KLEINMAN, ESQ.

21

Bk 25312 Pg 2450 CFN 20070093440 01/26/2007 15:09:42 Pg 21 of 21 Mia-Dade Cty, FL

STATE OF FLORIDA, COUNTY OF DADE
I HEREBY CERTIFY that the foregoing is a true and correct copy of the original on file in this office.
HARVEY. RUVIN, CLERK, of Circuit and County Court
Deputy Clerk

Jsg:lt

IN THE CIRCUIT OF THE 11TH
JUDICIAL CIRCU: I AND FOR
MIAMI-DADE COUNTY, FLORIDA

9/l

GENERAL JURISDICTION DIVISION

JEANNETTE HAUSLER *as*
*Successor Personal Representative*
*of the Estate of* ROBERT OTIS FULLER,
("BOBBY FULLER"), *Deceased,* on behalf
of THOMAS CASKEY as Personal
Representative of the Estate of LYNITA
FULLER CASKEY, surviving daughter
of ROBERT OTIS FULLER, The
ESTATE OF ROBERT OTIS FULLER,
FREDERICK FULLER, FRANCIS
FULLER, GRACE LUTES, JEANNETTE
HAUSLER, AND IRENE MOSS

          Plaintiffs,

vs.

THE REPUBLIC OF CUBA, FIDEL CASTRO
RUZ, individually and as President of the
State and Council Of Ministers, Head of
the Communist Party and Commander-in
Chief of the Military, RAUL CASTRO RUZ,
individually and as First Vice President Of
the Council of State and Council of Ministers
and Head of the CUBAN REVOLUTIONARY
ARMED FORCES, The CUBAN
REVOLUTIONARY ARMED FORCES,
and  EL MINISTERIO DEL INTERIOR,

          Defendants.

_____/

CASE NO.  02-12475    C A o y

THE CＲＩＧＩＮＡＬ FＩＬＥＤ
IN TＲＥＬ.ＵＲＣＯＵＲＴ

CLＥＲＫ ＣＩＲＣＩ NＴ ＆ ＣＯＵＮＴＹ ＬＯＢＲＴＳ
DADE COUNTY, FLORlDA

ON_____
         SEP 0 6 2005

## SECOND
## AMENDED
## C O M P L A I N T

     Plaintiffs, JEANNETTE HAUSLER, *as successor Personal Representative of the*

*Estate of ROBERT OTIS FULLER,* ("BOBBY FULLER" ) *Deceased,* on behalf of

THOMAS CASKEY, as Personal Representative of the Estate of Lynita Fuller Caskey,

surviving daughter of Robert Otis Fuller, *Deceased,* and The Estate of Robert Otis



EXHIBIT

D

FULLER v. The Republic of ''ba, Fidel Castro, etc.          CASE NO. 02-12475

Fuller, FREDERICK FULLER, FRANCIS, FULLER, GRACE LUTES, JEANNETTE

HAUSLER, and IRENE MOSS, demand Judgment against the **Defendants**, THE

REPUBLIC OF CUBA hereinafter referred to as ("CUBA") and FIDEL CASTRO RUZ,

("FIDEL CASTRO") individually, and as President of the State and Council Of

Ministers, Commander-in-Chief of the Military, and Head of the Communist Party ,

RAUL CASTRO RUZ, ("RAUL CASTRO") individually, and as First Vice-President Of

the Council of State and First Vice-President of the Council of Ministers, and Head of

the CUBAN REVOLUTIONARY ARMED FORCES, THE CUBAN REVOLUTIONARY

ARMED FORCES, ("MILITARY") and EL MINISTERIO DEL INTERIOR, referred to as

("MINISTRY OF THE INTERIOR") and alleges as follows:

      1.    This is an action for damages in excess of the minimal jurisdictional limits

of this Court.

      2.    At all times material hereto, LYNITA FULLER CASKEY, was a national of

the United States of America and a resident of South Florida.

      3.    At all times material hereto, JEANNETTE HAUSLER, was and is the duly

appointed Successor Personal Representative of the Estate of Robert Otis Fuller,

Deceased, and is the proper party to bring and maintain this action.

      4.    At all times material hereto, THOMAS CASKEY was and is the duly

appointed Personal Representative of the Estate of LYNITA FULLER CASKEY,

deceased, and is the proper party to bring and maintain this action on her behalf.

      5.    At all times material hereto, FREDERICK FULLER, FRANCIS FULLER,

GRACE LUTES, JEANNETTE HAUSLER, and IRENE MOSS were and are the siblings

of ROBERT OTIS FULLER and shared an interest in certain property and other

economic interests as more specifically set forth below.

FULLER v. The Republic of Cuba, Fidel Castro, etc.          CASE NO. 02-12475

6.      At all times material hereto, Defendant, "CUBA" was and is, a foreign sovereign state as defined by the terms and provisions of 28 U.S.C. § 1603.

7.      At all times material hereto, Defendant, FIDEL CASTRO was and remains the President of the State and Council of Ministers, Head of the Communist Party and Commander In-Chief of the Cuban Revolutionary Armed Forces (MILITARY) and was acting both individually and in the course and scope of the stated capacity(ies).

8.      At all times material hereto, Defendant, RAUL CASTRO, was and remains the First Vice President of the Council of State and Council of Ministers and the Head of the Cuban Revolutionary Armed forces and was acting both individually and in the course and scope of the stated capacity(ies).

9.      At all times material hereto, Defendant, MILITARY and is, an agency or instrumentality of Cuba and defined and referenced in the foreign Sovereign Immunities Act, 28 U.S.C. § 1603.

10.     At all times material hereto, Defendant, MINISTRY OF THE INTERIOR, was and is, an agency or instrumentality of CUBA as defined and referenced in The Foreign Sovereign Immunities Act, 28 U.S.C. § 1606.

11.     This court has jurisdiction over the subject matter of this cause pursuant to the terms of 28 U.S.C. § 1330 and §1331 as Plaintiffs' claims are brought pursuant to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602, et seq.

12      Defendants are subject to suit in a court of competent jurisdiction in any state court in the United States pursuant to the provisions of 28 U.S.C. § 1605. Rein v. Socialist People's Libyan Arab, 995 F.Supp. 325 (ED NY 1998).

3

FULLER v. The Republic of Cuba, Fidel Castro, etc.            CASE NO. 02-12475

13.    Congress has crafted an exception to the Foreign Sovereign Immunities Act, through the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Under 28 U.S.C. § 1605(a)(7), the sovereign immunity of a foreign state is waived when a U.S. national Plaintiffs seek money damages in United States courts for acts of extrajudicial killing for which the foreign state is responsible.

14.    The substantive cause of action is based upon the Civil Liability for Acts of State Sponsored Terrorism, 28 U.S.C.A. § 1605. Said statute creates a cause of action against agents of a foreign state that act under the conditions specified in section 1605(a)(7) of the Foreign Sovereign Immunities Act. See Alejandre v. The Republic of Cuba and the Cuban Air Force, 42 F. Supp. 2d 1317 (SD Fla. 1999).

15.    A foreign nation is liable for damages and vicariously liable for punitive damages to the individual's legal representative, or to any person who may be a claimant in an action for wrongful death. Cuba is vicariously liable for the actions of its agents/instrumentalities, including the actions of FIDEL CASTRO,  RAUL CASTRO, MILITARY and MINISTRY OF THE INTERIOR pursuant to 28 U.S.C. §1606.  See Gibbons v. Republic of Ireland, 532 F. Supp. 668, (DC DC 1982)(an agent or instrumentality can be held liable for punitive damages); de Leteiler v. Republic of Chile, 502 F. Supp. 259 (DCDC 1980); see also, Anderson v. Islamic Republic of Iran, 90 F. Supp. 2d 107, (D.DC 2000)(awarding punitive damages to American who had been held hostage and tortured by Islamic terrorists sponsored by Iranian Ministry of Information).

16.    Summary executions are considered "extrajudicial killing" within the meaning of 28 U.S.C. § 1350. See Lafontant v. Aristide, 844 F.Supp. 128 (E.D.N.Y. 1994) (dicta).

4

17.    Defendant CUBA is designated to be a state sponsor of terrorism under the terms and provisions of 56(j) of Export Administration Act of 1979, 50 U.S.C. § 2405(j).

## FACTS OF THE CASE

18.    In 1903, Jennie M. Fuller, (paternal grandmother of Plaintiff), moved to Holguin, Cuba with her family from Massachusetts. Her father, Alvin Jewett purchased and developed certain land and held other assets and personal properties in Holguin, Cuba including but not limited to:

    Plantation at Holguin, Cuba consisting of approximately 120 caballerias of land and improvements thereof--(approximately 4,000 acres of land)
    A saw mill, equipment, livestock (cattle) crops,
    A sugar cane business and other personal property

The family owned and operated a saw mill, they raised crops, cattle and grew sugar cane on the island.

19.    Jennie M. (Jewett) Fuller, (paternal grandmother of Plaintiff), married William Otis Fuller in 1925, (both United States citizens) and had seven children, including the Plaintiff's father, Robert Otis Fuller all of which were born in Cuba.   Bobby Fuller was born on May 11, 1934 in Santiago de Cuba

20.    The Fuller family assets and properties located in Holguin, Cuba were jointly owned by Plaintiff's paternal grandparents, Jennie M. Fuller and William Otis Fuller, *her husband,* and by Plaintiff's paternal uncle, Miles Chester Jewett.

21.    On July 21, 1940, the family formed a corporation called Cia. Agricola De Lewiston, S.A., a Cuban Corporation. All assets were assigned to *Cia. Agricola De Lewiston, S.A.,* which was created for the specific purpose of carrying on and/or conducting the family business in Cuba. The Cuban Corporation conducted business in

5

Cuba continuously from July 21, 1940 until August of 1959.

22.  In January of 1959, Fidel Castro and his 26th of July Communist revolutionary rebel army movement took power over Cuba and began to radically alter the economy and social structure of the island.

23.  By May of 1959, the Castro government, by and through the actions of the Defendants herein restricted or set forth the maximum limits of land ownerships allowed for individuals and corporate entities. All additional or excess (privately owned) land was expropriated or confiscated by the government.  shortly thereafter, all lands were nationalized and became "state owned" properties.

24.  In August of 1959, the Castro government, by and through the actions of the Defendants herein ordered that the Fuller family corporation be dissolved.

25.  By September 3, 1959, the family corporation, *Cia Agricola De Lewiston, S.A.* was formally dissolved pursuant to orders of the Castro government at which time the family distributed the corporate assets among its stockholders as follows:

Mr. & Mrs. William Otis Fuller      68.994 caballerias of land/ **2,287.97 acres**
Mr. & Mrs. Miles Chester Jewett  58.730 caballerias of land/ 1,947.60 acres
*(1 caballeria equals 33.162 acres)*

26.  By December of 1959, the Cuban Communist Revolution was in full force and the survival of existing businesses and institutions were threatened.  Due to the foregoing,  the late William Otis Fuller returned to the U.S. while Jennie M. Fuller, his wife remained in Cuba to look over and protect the Fuller family land and their assets.

27.  As of February of 1960, the Fullers' land, property, and saw mill including all of it's improvements, livestock, personal belongings and other items of personal value situated on the property, were intervened, and/or confiscated by the Castro

6

FULLER v. The Republic c    uba, Fidel Castro, etc.        CASE NO. 02-12475

government, by and through the actions of the Defendants herein.

28.    Subsequently thereafter, the Plaintiff, LYNITA FULLER CASKEY's father, Bobby Fuller, ventured to Cuba in an effort to protect his family's land, businesses and other interests.

29.    On October 15, 1960, Bobby Fuller (ex-U.S. Marine) along with another American and two Cuban nationals, were captured and arrested by Castro agents who charged them with counter-revolutionary activities. By 4:00 P.M. on the same day, Bobby Fuller and the three others were placed in a sham trial held in Santiago De Cuba. The trial and subsequent appeal, sentencing and execution were conducted and/or carried out under the auspices of the Defendants, MILITARY and/or THE MINISTRY OF THE INTERIOR, at the direction of Defendants, FIDEL CASTRO AND RAUL CASTRO. The prisoners including Bobby Fuller were all convicted within a few hours followed by an immediate appeal which took less than fifteen minutes.    Sentences were instantaneously imposed and upheld as follows:

The two Cuban Nationals were sentenced to imprisonment.

The two Americans were sentenced to death by firing squad.

30.    By 4:20 A.M.- October 16, 1960, less than twenty four hours after his capture and arrest, agents of the Defendants lead Bobby Fuller to a led Bobby Fuller to a firing squad where he was shot and killed after being tortured by having his blood drained from his body. Thereafter, his body was thrown into an unmarked mass grave in an unknown location.

7

FULLER v. The Republic of  Cuba, Fidel Castro, etc.          CASE NO. 02-12475

## COUNT I - WRONGFUL DEATH

Plaintiffs re-allege and re-asserts paragraphs 1 through 30 as if fully set forth herein.

31.   On October 16, 1960, Defendants intentionally, unlawfully, and with complete disregard for human life, tortured and executed ROBERT OTIS FULLER.

32.   Defendants, caused the deliberate and wrongful death of ROBERT OTIS FULLER by directing and participating in the torture and execution of the deceased.

33.   As a direct and proximate result of the Defendants' actions, the Plaintiffs have suffered the following damages:

a.   *Lynita Fuller Caskey, surviving daughter, lost the support and services of the Decedent, Robert Otis Fuller, and;*

b.   *Lynita Fuller Caskey, surviving daughter, suffered the loss of her father's love, companionship and protection, and;*

c.   *Lynita Fuller Caskey, surviving daughter, suffered severe mental pain and anguish, and;*

d.   *The Estate of Robert Otis Fuller lost net accumulations and sustained economic losses, and;*

e.   *The Estate of Robert Otis Fuller also seeks compensation for the pain and suffering of Robert Otis Fuller prior to his death.*

f.   *The siblings of Robert Otis Fuller, Frederick Fuller, Francis Fuller, Grace Lutes, Jeannette Hausler, and Irene Moss lost their interest in property and economic interests resulting in extraordinary pecuniary loss.*

g.   *Any and all other damages to which Plaintiffs may be entitled.*

WHEREFORE, Plaintiffs, JEANNETTE HAUSLER, as Successor Personal Representative of the Estate of ROBERT OTIS FULLER, Deceased, on behalf of

8

Thomas Caskey as Personal Representative of the Estate of LYNITA FULLER CASKEY, surviving daughter of Robert Otis Fuller and the Estate of Robert Otis Fuller , FREDERICK FULLER, FRANCIS FULLER, GRACE LUTES, JEANNETTE HAUSLER, and IRENE MOSS, demand Judgment against the Defendants, for compensatory damages in excess of $75,000, plus interest and costs.

## **COUNT II - PUNITIVE DAMAGES**

Plaintiffs re-allege and re-assert paragraphs 1 through 33 as if fully set forth herein.

34.    The extreme and outrageous acts of Defendants, of intentionally torturing and executing the deceased, ROBERT OTIS  FULLER constitute willful and/or wanton acts.

35.    Pursuant to 28 U.S.C. § 1606, Plaintiffs are entitled to recover punitive damages from Defendants, in order to punish said Defendants for their intentional, willful and wanton acts as outlined above and to deter the continuation of similar acts and/or conduct.  See Flatow v. The Islamic Republic of Iran, et al,  999 F. Supp. 1 (U.S. District Court, District of Columbia, 1998) , Stern v. Islamic Republic of Iran, et al.,  271 F. Supp. 2d 286 (U.S. District  Court, District of Columbia, 2003).  See also, West v. Multibanco Comerex, S.A., 807 F.2d 820, (9th Cir. 1987) cert denied 107 S.Ct. 2483.

36.    Extraordinary punitive damages are required in this case in order to effectuate the punishment and deterrence envisioned by the passage of the Anti-Terrorism and Effective Death Penalty Act of 1996 and relevant sections thereof as outlined above, given the outrageous acts of the Defendants in torturing and executing Robert Fuller,  and the Defendants' prolific continuation of international terrorism, and sponsorship thereof, with the United States of America and its citizens being its primary

9

target as further delineated below.

37.    From October of 1960 through the present, the Defendants have continuously designed, planned, supported, sponsored and/or carried out acts of domestic and international terrorism which have been wholly undeterred.

38.    Defendants have resolutely stated and confirmed that it is their intent to continue such domestic and international terrorism in the future.

39.    Cuba remains to this date a designated "State Sponsor of Terrorism" along with Iran, North Korea, Syria, Lybia and Suddan, according to the U.S. Department of State   (although the latter two have recently taken considerable measures to cooperate in the Global war on terrorism.) ("Iraq was removed after its liberation by coalition forces.")

40.    Defendants have provided training, intelligence, financial support and otherwise sponsored international terrorist groups, including but not limited to:

- ELN  [National Liberation Army ]
- ETA  [Basque Separatist  Movement- Fatherland & Liberty- Basque Region, Spain]
- F.A.R.C.  [Fuersas Armadas Revolucionaria/Revolutionary Armed Forces--Columbian]
- IRA  [Irish Republican Army -  Ireland/United Kingdom]
- Los Macheteros-  [US/Puerto Rico]
- M-19  [Columbian]
- Tupamaros or MNL  [Movimiento Nacional Revolucionario- Uruguayan]
- Tupac Amaru  [Peruvian]

10

FULLER v. The Republic of Cuba, Fidel Castro, etc.          CASE NO. 02-12475

Each and every one of which have carried out indiscriminate acts of international terrorism causing the deaths of untolled numbers of innocent victims and the destruction of personal and public property.

41.    As early as the mid 1960's the Defendants established training camps in and around Cuba attended by members of those terrorists organizations outlined above, as well as terrorist organizations engaged in such activities in the Middle East and Africa.

42.    In January of 1966, the Defendants sponsored in Havana, Cuba, the Tri-Continental Conference whose attendees had a stated purpose of devising a global strategy against "American and Western Imperialism." As a result of that conference the Defendants facilitated the publication of the "Manual for the Urban Guerilla," which encouraged international terrorist acts and provided instructions as to how to effectively carry out such as acts as kidnappings and other terror tactics. In so doing, the Defendants not only provided international terrorist organization with the means and expertise to carry out their murderous terrorist acts, but also created and/or facilitated an international terrorist network and support structure. This manual has been translated into numerous languages and distributed world-wide by the Defendants. In January of 1984, the Defendants held a similar meeting in Mexico City in which a central theme [that] emerged was, "kill Americans."

43.    The Macheteros trained and financed by the Defendants, have committed enumerable acts of international terrorism, its primary target being the United States, including the following:

    1)    In 1979, the ambush of a United States Navy bus killing two US sailors and wounding nine.

11

2)      The 1981 attack on the Puerto Rican National Guard base which destroyed 11 aircraft.

3)      The 1983 armed robbery of a Wells Fargo Depo in West Hartford, Connecticut in which they absconded with 7.1 million dollars, the second largest cash robbery in American history. This resulted in the 1985 indictment of 19 members of the Macheteros Group. The leader of this group, Victor Gerena was never taken into custody and is known by the United States federal authorities to be living a protected, harbored life in Cuba. The FBI has specifically uncovered that this operation was financed by the Defendants and, in fact, approximately 2 million dollars of the proceeds from the robbery went to Cuba. Mr. Gerena is on the FBI's Ten Most Wanted List and is the subject of a federal $1 million dollar reward offer. The founder of the Macheteros Group, Feliberto Ojeda Rios, known to be a former member of the Cuban Intelligence Service, is also the subject of a United States Federal reward offer of $500,000. Like Gerena, Ojeda and two other Machetero terrorists involved in the robbery, Norberto and Avelino Gonzales-Claudio (the latter two with rewards of $100,000.00 each, posted) are known to federal authorities to be living in Cuba as well.

4).     Bombed Puerto Rican banks, businesses and electric and power facilities.

44.   After receiving advanced weapons and demolition training in Cuba, the Tupamaros attacked the US Embassy in 1984, bombed the offices of Texaco in 1985 and attacked the residence of the United States Ambassador in 1985, all in Lima Peru.

45.   Illich Ramirez Sanchez, known world-wide to the law enforcement and intelligence communities as, "Carlos the Jackal" responsible for numerous terrorist acts in Europe, attended the 1966 Tri-Continental Conference in Havana, and later trained in urban tactics, automatic weapons, explosives and sabotage in Cuba.

46.   In addition to training thousands of international terrorists from those groups previously identified, the Defendants have established permanent offices and/or headquarters for the ETA, the IRA, the F.A.R.C. and the ELN, all organizations who have for decades and to this date remain steadfastly dedicated to international

12

Case 1:09-cv-22600-JLK   Document 1   Entered on FLSD Docket 09/02/2009   Page 64 of 68

FULLER v. The Republic of Cuba, Fidel Castro, etc.          CASE NO. 02-12475

terrorists acts.

47.     In addition to providing training, financial support, offices and networking to all of the aforementioned, the Defendants have provided safe harbor to dozens of known international terrorists many of whom have committed serious crimes on U.S. soil. Federal authorities have identified some 77 known fugitives believed to be harbored by the Defendants in Cuba[1], these include, Macheteros Garena, Ojeda-Rios, Noberto and Avelino Gonzalez-Claudio, as noted above, Black Liberation Army leader, Joann Chesimard a/k/a Assata Shakur, one of New Jersey's most wanted fugitives for killing a New Jersey State Trooper in 1973, Charlie Hill, a member of the Republic of the New Africa Movement, wanted for the hijacking of TWA 727 and the murder of a New Mexico State Trooper, Michael Feeney, a member of the Republic of New Africa Movement, also wanted for the murder of a New Mexico State Trooper, Ishmael Ali, convicted of multiple murders in the Virgin Islands, Ralph Goodwin accused of possession of explosives, Brian Wilson, accused of assassination, high level ETA terrorists, Jos Angel Urtiaga Martinez and Jesus Lucio Abrisqueta Corte, and several other E.T.A. members.

48.     The Defendants' acts of domestic terrorism have continued, if not increased, unabated over the last 45 years.

49.     In July of 1994, the Defendants were responsible for the murder of 41 innocent victims, including ten children, when they ordered three Cuban fire boats to attack an aging and dilapidated tug boat with 72 Cuban citizens aboard, sinking the vessel, an act condemned by the Inter-American Commission on Human Rights and the

---

[1]     As of 2000, the FBI estimated this number at no less than 77 fugitives avoiding crimes committed in or against the United State of America.

13

Organization of American States, noting, *"clear evidence that it was not an accident, but a pre-meditated and intentional act."* This horrendous act was then exacerbated by the Defendants rejection of the family members request to take measures to recover the victims' bodies.

50.    On February 24, 1996, Defendants, ordered their Cuban Mig aircraft to shoot down three civilian planes operated by Brothers to the Rescue on a humanitarian mission over international waters, causing the death of three U.S. Citizens, Armando Alejandre, Jr., Carlos Costa, Mario DeLa Pena and one U.S. resident, Pablo Morales. This was a pre-meditated, and in fact, a carefully orchestrated and planned act on the part of the Defendants. In order to carry out this terrorist act and otherwise undermine and infiltrate the armed services of the United States of America, the Defendants established a spy network known as "The Wasp Network." The United States Government later indicted 16 members of this spy ring, seven admitted involvement following their arrests, five were tried and convicted and four were successful in fleeing the United States to return to Cuba. Two members of this spy ring, Rene Gonzalez and Juan Pablo Roque, had succeeded in joining and/or infiltrating the Brothers to the Rescue organization, in part to obtain closely held schedules of the organization's flights over the Florida straights in search of people fleeing Cuba in rafts and other watercraft. Documents released during the spy trial revealed that the Defendants ordered these agents that *"under no circumstances should agents, German or Caster, (code names for Gonzalez and Roque )* fly with BTTR on the days of February 24, 25, 26 and 27.*"*

51. After two of the three aircraft were shot down and their occupants killed, the Defendants forwarded a congratulatory message to their agents acknowledging their role as "decisive".

14

52.  Similarly, the terrorism on Cuban soil, including scores upon scores of extra-judicial proceedings, tortures and killings continues unabated.  It is a matter of public record, [2] that in 2003, no less than 75 peaceful dissidents were subject to sham trials and extra-judicially sentenced to prison terms averaging 20 years.

53.  To this date, political prisoners and dissidents receive extra-judicial sentences and are often tortured and many times die in custody.  Security forces and prison officials continue to beat and otherwise abuse these detainees and prisoners.

54.  One recent example of the continued summary proceedings carried on by the Defendants is documented by the sham trial and quick execution of three men charged with hijacking a passenger ferry boat in April of 2003.  These three men, charged with the unprecedented crime of, "very grave acts of terrorism," received sham summary trials, were sentenced to death by firing squad, followed by an appeal to and rejection by the Cuban Supreme Tribunal and Ruling Counsel of State and thereafter were executed by firing squad, all within a period of less than three days.

55.  At Tehran University in 2001, Defendant, Fidel Castro, proudly proclaimed that *"Iran and Cuba, in cooperation with each other, can bring America to its' knees."*  Since that time, the Defendants have furthered a very disturbing partnership with the Iranian government, pursuant to which the Defendants have provided dual use biological and nuclear research and technology.

56.  In the year 2000, the Defendants specifically refused to sign a resolution crafted by the Spanish government denouncing ETA terrorism at the 2000 Ibero-American Summit in Panama.

---

[2]  See annual report of Human Rights Practices for 2003, and publications of the House International Relations Committee

15

<u>FULLER v. The Republic of Cuba, Fidel Castro, etc.</u>          CASE NO. 02-12475

WHEREFORE, Plaintiffs, JEANNETTE HAUSLER, as Successor Personal

Representative of the Estate of Robert Oits Fuller, Deceased, on behalf of Thomas

Caskey, as Personal Representative of the Estate of LYNITA FULLER CASKEY,

Surviving daughter of Robert Otis Fuller, and the Estate of Robert Otis Fuller demand

judgment against the Defendants, THE REPUBLIC OF CUBA ("CUBA"), FIDEL

CASTRO RUZ, ("FIDEL CASTRO")  individually and as President of the State and

President of the Council of Ministers, Head of the Communist Party and Commander-in-

chief of the Military, RAUL CASTRO RUZ, ("RAUL CASTRO") individually, and as First

Vice-President Of the Council of State and First Vice-President of the Council of

Ministers and Head of the CUBAN REVOLUTIONARY ARMED FORCES, THE CUBAN

REVOLUTIONARY ARMED   FORCES, ("MILITARY") and EL MINISTERIO DEL

INTERIOR, ("MINISTRY OF THE INTERIOR") in order to punish the Defendants for past

actions and deter the continuation of the support and sponsorship of international

terrorism, as well as costs, interests and other relief which this Court deems appropriate.

WE HEREBY CERTIFY that a true and correct copy of the foregoing Second

Amended Complaint was served upon Defendant, The Republic of Cuba, c/o- El

Ministerio De Relaciones Exteriores located at: Calzada # 360, Vedado, La Habana,

Cuba  this 6th day of September, 2005, and all other defendants will be served in

accordance with the applicable laws.

Law Offices of JOHN S. GAEBE,P.A.
*Counsel for Plaintiffs*
3211 Ponce DeLeon Blvd.#201
Coral Gables, FL 33134
Phone (305) 443-1922
Fax   (305) 448-1917

BY:  _____
     JOHN S. GAEBE, ESQ.
     Fla. Bar No. 304824

RASCO, REININGER, PEREZ
& ESQUENAZI, P.L.
*Co-Counsel for Plaintiffs*
283 Catalonia Avenue, 2nd Floor
Coral Gables, FL 33134
Phone (305) 476-7100
Fax   (305) 476-7102

BY: _____
    ALFONSO PEREZ, ESQ.
    Fla. Bar No. 220426

596671

16

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 09-20881-CIV-JORDAN

JEANNETTE FULLER HAUSLER as
Successor Personal Representative of the
Estate of ROBERT OTIS FULLER, ("BOBBY
FULLER") Deceased,

       Plaintiff/ Judgment Creditor,

vs.

THE REPUBLIC OF CUBA, FIDEL CASTRO
RUZ, individually and as President of the State
and Counsel of Ministers, Head of The
Communist Party and Commander-in-Chief of
the Military, RAUL CASTRO RUZ,
individually and as First Vice President of the
Counsel of State and Council of Ministers and
Head of the CUBAN REVOLUTIONARY
ARMED FORCES, and EL MINISTERIO
DEL INTERIOR,

       Defendants/Judgment Debtors,

vs.

IBASIS, INC.,

       Garnishee.

_____

**JOINT SCHEDULING REPORT AND
GARNISHEES' UNOPPOSED REQUEST
FOR SCHEDULING CONFERENCE**

    Pursuant to Local Rule 16.1(B)(2) and Federal Rule of Civil Procedure 26(f), on April

22, 2009, Counsel for Plaintiff, John Gaebe, Esq. and Karen O. Stewart, Esq. and Counsel for



EXHIBIT
E